1   AARON D. LOVAAS, ESQ. SBN 5701
    DAVID L. EDELBLUTE, ESQ. SBN 14049
2   NEWMEYER & DILLION LLP
    3800 Howard Hughes Pkwy, Suite 700
3   Las Vegas, Nevada  89169
    Telephone: (702) 777-7500
4   Facsimile: (702) 777-7599
    Aaron.Lovaas@ndlf.com
5   David.Edelblute@ndlf.com

6   Attorneys for Defendants
    NORTHLAND MECHANICAL CONTRACTORS,
7   INC., a/k/a NORTHLAND MECHANICAL
    SERVICES a/k/a NORTHLAND MECHANICAL
8   SOLUTIONS and SCIENCE CENTER DRIVE,
    LLC.
9

10                  UNITED STATES DISTRICT COURT

11                      DISTRICT OF NEVADA

12

13  NEVADA CORPORATE
    HEADQUARTERS, INC., a Nevada
    corporation,
14
                                          CASE NO.:
15                  Plaintiff,

16  vs.                                   **NOTICE OF REMOVAL**

17  SELLERS PLAYBOOK, INC., a
    Minnesota Corporation; MATTHEW R.
18  TIEVA, an individual; JESSIE C. TIEVA,
    an individual; SELLERS ONLINE,
19  assumed named; SELLERS SYSTEMS,
    assumed name; NORTHLAND
20  MECHANICAL CONTRACTORS, INC.,
    a Minnesota Corporation a/k/a
21  NORTHLAND MECHANICAL
    SERVICES a/k/a NORTHLAND
22  MECHANICAL SOLUTIONS; SCIENCE
    CENTER DRIVE, LLC, a Minnesota
23  Limited Liability Company; EXPOSURE
    MARKETING COMPANY, a Minnesota
24  Limited Liability Company; DOES I
    through X and ROE Corporations or
25  Business Entities I through X, inclusive,

26                  Defendants.

27  ///

28  ///

NEWMEYER & DILLION LLP

TO:   THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA

Defendants, NORTHLAND MECHANICAL CONTRACTORS, INC., a Minnesota Corporation a/k/a NORTHLAND MECHANICAL SERVICES a/k/a NORTHLAND MECHANICAL SOLUTIONS (hereinafter "NORTHLAND") and SCIENCE CENTER DRIVE, LLC, a Minnesota Limited Liability Company (hereinafter "SCIENCE") (hereinafter collectively "Defendants"),  hereby give notice of removal of this action to the United States District Court for the District of Nevada, on the grounds of diversity of citizenship, pursuant to 28 USC §§ 1441(b) and 1446.  In support thereof, the Defendants state and allege as follows:

**Claim and Parties:**

1.     NORTHLAND and SCIENCE are two Defendants in the above-entitled action commenced on August 16, 2018, in the Eighth Judicial District Court, Clark County, Nevada, under case number A-18-779579-C.

2.     Service of the Summons and Complaint, claiming breach of contract and seeking declaratory relief, specific performance and additional damages, was made upon Defendants, through their statutory agent of the State of Minnesota, on August 22, 2018.

3.     That at the time of the filing of the Complaint, NORTHLAND was, and still is, a Minnesota corporation with its principal place of business in the State of Minnesota.

4.     That at the time of the filing of the Complaint, SCIENCE was, and still is a Minnesota limited liability company with its principal place of business in the State of Minnesota. Each of SCIENCE's individual members is incorporated and/or organized in, has its principal place of business in, and/or resides in a state other than Nevada.

5.     Defendants are informed and believe that Plaintiff in this action is at the time of filing of this Complaint and still is a Nevada corporation with its principal place of business in the State of Nevada and the same is alleged in the Complaint filed in case number A-18-779579-C in the Eighth Judicial District Court, Clark County, Nevada.

**Jurisdiction:**

6.     This Court has jurisdiction over this action under 28 USC §§ 1332 and 1441. Jurisdiction exists under 28 USC § 1332 because complete diversity of citizen ship exists between

NEWMEYER & DILLION LLP

Plaintiff, on one hand, and Defendants, on the other, and the amount in controversy exceeds $75,000, and is therefore an action over which the district courts also have original jurisdiction. See 28 USC § 1332(a).  Specifically, jurisdiction exists under 28 USC § 1332 because there is complete diversity between Plaintiffs and Defendant, and the amount in controversy substantially exceeds $75,000 in that Plaintiffs purport to have suffered damages in excess of $1 million.

7.    For the reasons set forth above, this Court has original jurisdiction over this action pursuant to 28 USC § 1332 and removal of the action to this Court its proper pursuant to 28 USC § 1441(a).

**Compliance with Statutory Requirements:**

8.    Pursuant to 28 USC § 1446(a), copies of all process, pleadings, and orders received by Defendants in this action are attached.

9.    Pursuant to 28 USC § 1446(6), this notice of removal is filed within 30 days of the receipt by Defendants of the pleadings setting forth the claims for relief upon which the action is based.

10.    Pursuant to 28 USC § 1446(d), Defendants will promptly provide written notice of the removal of this action to Plaintiffs, through their attorneys of record, and to the Eighth Judicial District Court, Clark County, Nevada.

Dated:   this 21ST day of September, 2018

NEWMEYER & DILLION LLP

By: _____

AARON D. LOVAAS, ESQ. SBN 5701
DAVID L. EDELBLUTE, ESQ. SBN 14049
3800 Howard Hughes Pkwy, Suite 700
Las Vegas, Nevada  89169
Telephone: (702) 777-7500
Facsimile: (702) 777-7599

Attorneys for Defendants
NORTHLAND MECHANICAL
CONTRACTORS, INC. and SCIENCE
CENTER DRIVE, LLC.

## DISTRICT COURT CIVIL COVER SHEET  A-18-779579-C

County, Nevada

Case No. _____
*(Assigned by Clerk's Office)*

Department 31

### I. Party Information *(provide both home and mailing addresses if different)*

Plaintiff(s) (name/address/phone):

Nevada Corporate Headquarters
4730 S. Fort Apache Rd., Ste. 300
Las Vegas, Nevada 89147
(800) 508-1890

Attorney (name/address/phone):
Kurt Harris, Esq., P.C.
4730 S. Fort Apache Rd., Ste. 300
Las Vegas, Nevada 89147
(702) 252-3838

Defendant(s) (name/address/phone):

Sellers Playbook, Inc.
9001 Science Center Drive
New Hope, Minnesota 44528
(800) 919-2298

Attorney (name/address/phone):
Unknown

### II. Nature of Controversy *(please select the one most applicable filing type below)*

**Civil Case Filing Types**

| Real Property | Negligence | Torts |
|---|---|---|
| **Landlord/Tenant** | **Negligence** | **Other Torts** |
| ☐ Unlawful Detainer | ☐ Auto | ☐ Product Liability |
| ☐ Other Landlord/Tenant | ☐ Premises Liability | ☐ Intentional Misconduct |
| **Title to Property** | ☐ Other Negligence | ☐ Employment Tort |
| ☐ Judicial Foreclosure | **Malpractice** | ☐ Insurance Tort |
| ☐ Other Title to Property | ☐ Medical/Dental | ☐ Other Tort |
| **Other Real Property** | ☐ Legal | |
| ☐ Condemnation/Eminent Domain | ☐ Accounting | |
| ☐ Other Real Property | ☐ Other Malpractice | |

| Probate | Construction Defect & Contract | Judicial Review/Appeal |
|---|---|---|
| **Probate** *(select case type and estate value)* | **Construction Defect** | **Judicial Review** |
| ☐ Summary Administration | ☐ Chapter 40 | ☐ Foreclosure Mediation Case |
| ☐ General Administration | ☐ Other Construction Defect | ☐ Petition to Seal Records |
| ☐ Special Administration | **Contract Case** | ☐ Mental Competency |
| ☐ Set Aside | ☐ Uniform Commercial Code | **Nevada State Agency Appeal** |
| ☐ Trust/Conservatorship | ☐ Building and Construction | ☐ Department of Motor Vehicle |
| ☐ Other Probate | ☐ Insurance Carrier | ☐ Worker's Compensation |
| **Estate Value** | ☐ Commercial Instrument | ☐ Other Nevada State Agency |
| ☐ Over $200,000 | ☐ Collection of Accounts | **Appeal Other** |
| ☐ Between $100,000 and $200,000 | ☐ Employment Contract | ☐ Appeal from Lower Court |
| ☐ Under $100,000 or Unknown | ☑ Other Contract | ☐ Other Judicial Review/Appeal |
| ☐ Under $2,500 | | |

| Civil Writ | | Other Civil Filing |
|---|---|---|
| **Civil Writ** | | **Other Civil Filing** |
| ☐ Writ of Habeas Corpus | ☐ Writ of Prohibition | ☐ Compromise of Minor's Claim |
| ☐ Writ of Mandamus | ☐ Other Civil Writ | ☐ Foreign Judgment |
| ☐ Writ of Quo Warrant | | ☐ Other Civil Matters |

*Business Court filings should be filed using the Business Court civil cover sheet.*

August 11, 2018
_____
Date

_____
Signature of initiating party or representative

*See other side for family-related case filings.*

Nevada AOC - Research Statistics Unit
Pursuant to NRS 3.275

Form PA 201
Rev 3.1

SUMM
KURT K. HARRIS, ESQ.
Nevada Bar No. 5354
4730 S. Fort Apache Rd., Suite 300
Las Vegas, Nevada 89147
(702) 252-3838
(702) 852.0337 Facsimile

Attorney for Plaintiff,
Nevada Corporate Headquarters, Inc.

## DISTRICT COURT

## CLARK COUNTY, NEVADA

NEVADA CORPORATE HEADQUARTERS,
INC., a Nevada corporation,

        Plaintiff,

vs.

SELLERS PLAYBOOK, INC., a Minnesota
Corporation; MATTHEW R. TIEVA, an
individual; JESSIE C. TIEVA, an individual;
SELLERS ONLINE, assumed name;
SELLERS SYSTEMS, assumed name
NORTHLAND MECHANICAL CONTRACTORS,
INC., a Minnesota Corporation; a/k/a
NORTHLAND MECHANICAL SERVICES; a/k/a
NORTHLAND MECHANICAL SOLUTIONS;
SCIENCE CENTER DRIVE, LLC; a Minnesota
Limited Liability Company; EXPOSURE
MARKETING COMPANY, a Minnesota Company;
DOES I through X and ROE Corporations or
Business Entities I through X, inclusive,

        Defendants.

CASE NO.: A-18-779579-C

DEPT NO.: 31

## SUMMONS

**NOTICE! YOU HAVE BEEN SUED. THE COURT MAY DECIDE AGAINST YOU WITHOUT YOUR BEING HEARD UNLESS YOU RESPOND WITHIN 20 DAYS. READ THE INFORMATION BELOW.**

    TO THE DEFENDANT: A civil claim has been filed by the Plaintiff against you for relief set forth in the Complaint.

## SCIENCE CENTER DRIVE, LLC
### 9001 Science Center Drive
### New Hope, Minnesota 44528

1

1.  If you intend to defend this lawsuit, within 20 days after this Summons is served on you exclusive of the day of service, you must do the following:

     a.   File with the Clerk of this Court, whose address is shown below, a formal written response to the Amended Complaint in accordance with the rules of the Court.

     b.   Serve a copy of your response upon the attorney whose name and address is shown below.

2.  Unless you respond, your default will be entered upon application of the Plaintiff and this Court may enter a judgment against you for the relief demanded in the Amended Complaint, which could result   in the taking of money or property or other relief requested in the Amended Complaint.

3.  If you intend to seek the advice of an attorney in this matter, you should do so promptly so that your response may be filed on time.

STEVEN D. GRIERSON, CLERK OF COURT

By: _____

DEPUTY CLERK                DATE

Clark County District Court
200 Lewis Avenue
Las Vegas, Nevada 89101

VIVIAN A. CANELA

AUG 2 0 2018

Issued at direction of:

**Kurt K. Harris, Esq., P.C.**

Kurt Harris, Esq.
4730 S. Fort Apache Rd., Suite 300
Las Vegas, NV 89147
Attorney for the Plaintiff,

2

1  **SUMM**
   **KURT K. HARRIS, ESQ.**
2  Nevada Bar No. 5354
   4730 S. Fort Apache Rd., Suite 300
3  Las Vegas, Nevada 89147
   (702) 252-3838
4  (702) 852.0337 Facsimile

5  Attorney for Plaintiff,
   Nevada Corporate Headquarters, Inc.

6

7

8                         **DISTRICT COURT**

9                     **CLARK COUNTY, NEVADA**

10  NEVADA CORPORATE HEADQUARTERS,    )
    INC., a Nevada corporation,        )
11                                     )
                                       )
12              Plaintiff,             )       CASE NO.: A-18-779579-C
                                       )
13  vs.                                )       DEPT NO.: 31
                                       )
14  SELLERS PLAYBOOK, INC., a Minnesota )
    Corporation; MATTHEW R. TIEVA, an  )
    individual; JESSIE C. TIEVA, an individual; )
15  SELLERS ONLINE, assumed name;      )
    SELLERS SYSTEMS, assumed name      )
16  NORTHLAND MECHANICAL CONTRACTORS,)
    INC., a Minnesota Corporation; a/k/a )
17  NORTHLAND MECHANICAL SERVICES; a/k/a )
    NORTHLAND MECHANICAL SOLUTIONS;    )
18  SCIENCE CENTER DRIVE, LLC; a Minnesota )
    Limited Liability Company; EXPOSURE )
19  MARKETING COMPANY, a Minnesota Company)
    DOES I through X and ROE Corporations or )
20  Business Entities I through X, inclusive, )
                                       )
21              Defendants.            )
                                       )
22  _____)

23                         **SUMMONS**

24  **NOTICE! YOU HAVE BEEN SUED.  THE COURT MAY DECIDE AGAINST YOU WITHOUT**
    **YOUR BEING HEARD UNLESS YOU RESPOND WITHIN 20 DAYS.**
25  **READ THE INFORMATION BELOW.**

26
         TO THE DEFENDANT:  A civil claim has been filed by the Plaintiff against you for relief set
27  forth in the Complaint.

28              **NORTHLAND MECHANICAL CONTRACTORS INC.,**

                                      1

a/k/a  NORTHLAND MECHANICAL SERVICES
a/k/a  NORTHLAND MECHANICAL SOLUTIONS
9001 Science Center Drive
New Hope, Minnesota 44528

1.   If you intend to defend this lawsuit, within 20 days after this Summons is served on you exclusive of the day of service, you must do the following:

   a.   File with the Clerk of this Court, whose address is shown below, a formal written response to the Amended Complaint in accordance with the rules of the Court.

   b.   Serve a copy of your response upon the attorney whose name and address is shown below.

2.   Unless you respond, your default will be entered upon application of the Plaintiff and this Court may enter a judgment against you for the relief demanded in the Amended Complaint, which could result   in the taking of money or property or other relief requested in the Amended Complaint.

3.   If you intend to seek the advice of an attorney in this matter, you should do so promptly so that your response may be filed on time.

STEVEN D. GRIERSON, CLERK OF COURT

By:  _____   AUG 2 0 2018

DEPUTY CLERK                    DATE
Clark County District Court  VIVIAN A. CANELA
200 Lewis Avenue
Las Vegas, Nevada 89101

Issued at direction of:

**Kurt K. Harris, Esq., P.C.**

Kurt Harris, Esq.
4750 S. Fort Apache Rd., Suite 300
Las Vegas, NV 89147
Attorney for the Plaintiff,

2

Electronically Filed
8/16/2018 12:21 PM
Steven D. Grierson
CLERK OF THE COURT

**COMP**
**KURT K. HARRIS, ESQ.**
Nevada Bar No. 5354
4730 S. Fort Apache Rd., Suite 300
Las Vegas, Nevada 89147
(702) 252-3838
(702) 852.0337 Facsimile

Attorney for Plaintiff,
Nevada Corporate Headquarters, Inc.

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

| | |
|---|---|
| NEVADA CORPORATE HEADQUARTERS, INC., a Nevada corporation,<br><br>                    Plaintiff,<br><br>vs.<br><br>SELLERS PLAYBOOK, INC., a Minnesota Corporation; MATTHEW R. TIEVA, an individual; JESSIE C. TIEVA, an individual; SELLERS ONLINE, assumed name; SELLERS SYSTEMS, assumed name NORTHLAND MECHANICAL CONTRACTORS, INC., a Minnesota Corporation; a/k/a NORTHLAND MECHANICAL SERVICES; a/k/a NORTHLAND MECHANICAL SOLUTIONS; SCIENCE CENTER DRIVE, LLC; a Minnesota Limited Liability Company; EXPOSURE MARKETING COMPANY, a Minnesota Company DOES I through X and ROE Corporations or Business Entities I through X, inclusive,<br><br>                    Defendants. | CASE NO.:    A-18-779579-C<br><br>DEPT NO.:    Department 31<br><br><br><br><br>ARBITRATION EXEMPTION CLAIMED:<br><br>Amount in Controversy exceeds $50,000<br>Declaratory Relief<br>Injunctive Relief<br>Punitive Damages |

**COMPLAINT**

COMES NOW the Plaintiff, NEVADA CORPORATE HEADQUARTERS, INC., a Nevada Corporation, (hereinafter "NCH"), by and though its attorney of record, Kurt Harris, Esq., P.C., and hereby files this Complaint and alleges as follows:

////

1

## I.   PARTIES

1.   That at all time relevant herein Plaintiff, NEVADA CORPORATE HEADQUARTERS, INC. is a corporate entity with its principal of place of business in the state of Nevada.

2.   That at all times relevant herein, Defendant, SELLERS PLAYBOOK, INC. is a Minnesota Corporation, doing business in Nevada with its principal place of business at 9001 Science Center Drive, New Hope, Minnesota 55428.

3.   That, at all times relevant herein, Defendant, JESSE C. TIEVA, is an individual and corporate officer and owner and founder of SELLERS PLAYBOOK, INC. and the president of EXPOSURE MARKETING and is doing business in Clark County, Nevada or has specifically acquiesced to the jurisdiction of this Court residing at 5290 Black Oaks Lane North, Plymouth, Minnesota 55446

4.   That, at all times relevant herein, Defendant, MATTHEW R. TIEVA, is an individual and is President and owner and founder of SELLERS PLAYBOOK, INC. and the vice president and chief executive officer of EXPOSURE MARKETING COMPANY and is doing business in Clark County, Nevada or has specifically acquiesced to the jurisdiction of this Court with its principal place of business at 5290 Black Oaks Lane North, Plymouth, Minnesota 55446.

5.   That at all times relevant herein, Defendant, SELLERS ONLINE is an assumed name according to the State of Minnesota and is the trade name or dba of Defendant, EXPOSURE MARKETING COMPANY doing online business in the State of Nevada with its principal place of business listed as 5290 Black Oaks Lane North, Plymouth, Minnesota 55446.

6.   That at all times relevant herein, Defendant, SELLERS SYSTEMS is an assumed name according to the State of Minnesota and is the trade name or dba of Defendant,

2

EXPOSURE MARKETING COMPANY doing online business in the State of Nevada with its principal place of business listed as 5290 Black Oaks Lane North, Plymouth, Minnesota 55446

7.   That at all times relevant herein, EXPOSURE MARKETING COMPANY is a Minnesota Company, wholly owned by Defendants, MATTHEW R. TIEVA and JESSE C. TIEVA with its principal place of business at 5290 Black Oaks Lane North, Plymouth, Minnesota 55446 and doing online business and promoting and marketing the brands of defendants in the State of Nevada by way of SELLERS ONLINE, Minnesota assumed name.

8.   That at all times relevant herein Defendant, NORTHLAND MECHANICAL CONTRACTORS, INC., is a Minnesota Corporation, and is the successor in interest or the alter ego of SELLERS PLAYBOOK, INC. with its principal place of business at 9001 Science Center Drive, New Hope, Minnesota 55428.

9.   That at all times relevant herein Defendant, NORTHLAND MECHANICAL SOLUTIONS, Minnesota Assumed Name, is a dba or alter ego or trade name of Defendant, NORTHLAND MECHANICAL CONTRACTORS, INC. and all other Defendants.

10.   That at all times relevant herein Defendant, NORTHLAND MECHANICAL SERVICES, a Minnesota Assumed Name, is a dba or alter ego or trade name of Defendant, NORTHLAND MECHANICAL CONTRACTORS, INC. and all Defendants.

11.   That Defendant, SCIENCE CENTER DRIVE, LLC, is a Minnesota Limited Liability Company with its principal place of business at 9001 Science Center Drive, New Hope, Minnesota 55428.

12.     That at all times relevant herein Defendant, DOE (hereinafter "DOE"), is an agent and representative of Defendants. DOE'S acts described herein were independent and within the scope of their agency or employment with Defendants and each of them.

13.     That all Defendants are one in the same and are owned and operated by Defendants, JESSE C. TIEVA and MATTHEW R. TIEVA and are the alter egos of these individual Defendants such that Defendants have acted by and though a common enterprise and an interrelated network of companies that have a unified advertising and marketing practices, common ownership, officers, managers, business functions, employees, warehouse locations and office locations.

14.     That the true names and capacities, whether individual, corporate, partnership, associate or otherwise, of Defendant DOES I through X and ROE Corporations or Business Entities I through X, inclusive, are unknown to Plaintiff who therefore sues said defendants by such fictitious names. Plaintiff is informed and believes and thereon alleges that each of the defendants designated herein as DOE and ROE is responsible in some manner for the events and happenings referred to herein, and as a result proximately caused damages to Plaintiff as herein alleged. That Plaintiff will ask leave of this court to amend this Complaint to insert the true names and capacities of DOES I through X and ROE Corporations or Business Entities I through X, inclusive, when the same have been ascertained, and to join such defendants in this action.

## II.   JURISDICTION

15.     That the agreement signed by and between the parties hereto specifically stipulates to jurisdiction in Clark County, Nevada, specifically the Eighth Judicial District Court and therefore, jurisdiction is proper.

4

16.   That Defendants understood that the Eighth Judicial District Court in Nevada would be the appropriate forum as it has been learned by NCH that the Defendants have or had similar forum selection clauses or contracts or agreements and forms in which they specify the governing laws and jurisdiction with their agreements.

17.   Therefore, Defendants are aware, informed and understand that the appropriate forum is the Eighth Judicial District Court within the State of Nevada has jurisdiction over this dispute.

## III.   FACTS

18.   In and about February 3, 2017, Defendants, MATTHEW R. TIEVA and JESSIE C. TIEVA incorporated Defendant, SELLERS PLAYBOOK, INC.

19.   That Defendants, MATTHEW R. TIEVA and JESSIE C. TIEVA formed SELLERS PLAYBOOK as a means of teaching individuals in the public how to sell goods online through the use of Amazon and other online platforms.

20.   That Defendants, MATTHEW R. TIEVA and JESSIE C. TIEVA teach seminars of how to sell online and charge attendees and participants in their program for the information.

21.   That Defendants had a working relationship with NCH wherein NCH would compensate Defendants for referrals.

22.   That unbeknownst to NCH, Defendants have been accused of operating a common enterprise while engaging in deceptive acts and practices through their network of companies.

23.   That, upon information and belief, Defendant, SELLERS PLAYBOOK, INC. was referred to the Federal Trade Commission (FTC) by an anonymous competitor challenge on September 20, 2017 and had knowledge of the same.

24.   That on February 22, 2018, the Advertising Review Manager for the Better Business Bureau of Minnesota and North Dakota ("BBB") sent an email to Defendant, MATTHEW R. TIEVA posing several questions regarding Defendant, SELLER's PLAYBOOK business practices.

25.   That upon information and belief, on February 28, 2018, Defendant, MATTHEW R. TIEVA wrote back in an email, acknowledging the inquiries of the BBB.

26.   That, in and around April of 2018, Defendant, MATTHEW R. TIEVA and his spouse, JESSIE C. TIEVA approached Plaintiff, NEVADA CORPORATE HEADQUARTERS, INC. for the purpose of contracting for an advance of funds for referrals for their entity Defendant, SELLERS PLAYBOOK, INC.

27.   That Defendants, MATTHEW R. TIEVA and JESSIE C. TIEVA approached representatives of Plaintiff, indicating they were financially sound and that the funds would be used exclusively for building up business operations of SELLERS PLAYBOOK, INC., EXPOSURE MARKETING COMPANY also doing business as SELLERS ONLINE and SELLERS SYSTEMS and their other entities.

28.   That Defendants, MATTHEW R. TIEVA and JESSIE C. TIEVA did not disclose to NCH that they personally, SELLERS ONLINE and SELLERS PLAYBOOK were under investigation by the FTC at the time of the negotiations.

29.   That, upon information and belief, the Minnesota Attorney General's Office informed Defendants they were being investigated.

30.   That based upon the misrepresentations and lack of disclosures, NCH negotiated a contract in good faith, wherein SELLERS PLAYBOOK, INC. would receive an advance of one million dollars and in exchange for the funds, Defendants would provide NCH with customer referrals at a reduced rate until the funds were made up in full.

31.   The funds were to specifically to be used to develop the business, legally, and to expand business opportunities.

32.   That in exchange for the advance, Defendants were to provide NCH with leads and other services which were designed to repay the advance.

33.   That the terms of the advance were reduced to a written SP & NCH Affiliate Lead Agreement.

34.   That on or about April 24th, 2018, all parties signed the Agreement.

35.   That the Agreement specifically states that all parties submit themselves to the jurisdiction and that all disputes would be resolved in the Eighth Judicial District Court, County of Clark, State of Nevada, therefore, jurisdiction is proper.

36.   That Defendants, MATTHEW R. TIEVA and JESSIE C. TIEVA received the advance funds in full on behalf of SELLERS PLAYBOOK, INC. and apparently their network of companies.

37.   That the advanced funds were specifically designated to be used to promote the business venture of SELLERS PLAYBOOK, INC. and to increase the business activities of the same such that the advance would be fully repaid within twenty-four (24) months, no more.

38.   That upon information and belief, Defendants, MATTHEW R. TIEVA and JESSIE C. TIEVA received the advanced funds and utilized the same for personal debts and diverted funds for the use of Defendant, NORTHERN MECHANICAL CONTRACTORS, INC. and others.

39.   That Defendant, SELLERS PLAYBOOK, INC. and Defendant, NORTHERN MECHANICAL CONTRACTORS, INC. and Defendants NORTHERN MECHANICAL

SOLUTIONS and NORTHERN MECHANICAL SERVICES all share the same location and building located at 9001 Science Center Drive, New Hope, Minnesota 55428.

40.  That upon information and belief, the advanced funds were diverted and utilized, contrary to the agreement, to other entities or personal debts or benefits controlled and managed and/or owned by the Defendants.

41.  That on or about July 30, 2018, the Federal Trade Commission and/or the Minnesota Attorney General's Office shut down Defendant, SELLERS PLAYBOOK, INC., took their website down, terminated their email, disconnected phone lines and seized the premises and property of the same, including bank accounts.

42.  That, upon information and belief, some of the funds in the account(s) may be NCH's advance.

43.  That on or about July 30, 2018, the Minnesota Attorney General's Office brought a suit against Defendants, SELLERS PLAYBOOK, INC., EXPOSURE MARKETING COMPANY, JESSIE CONERS TIEVA and MATTHEW R. TIEVA.

44.  That many customers have been left in the dark and no attempts or efforts have been made by the Defendants to contact NCH.

45.  Refunds have been requested of NCH due to the actions of Defendants.

46.  That Defendants ceased performing on the agreement and have not complied with the terms of the agreement.

47.  That according to a news release from the Minnesota Attorney General's Office, the suit alleges the company lured customers by claiming they could earn thousands of dollars per month selling products on Amazon.

48.   That according to the release of the Minnesota Attorney General's Office, the suit alleges Defendant, JESSIE C. TIEVA was previously involved in a similar scheme, known as FBA Stores, which was shut down by the FTC in March of 2018.

49.   That Defendant, JESSIE C. TIEVA did not disclose her involvement with the FBA Stores matter and scandal to NCH.

50.   That the suit, filed by the Minnesota Attorney General's Office charges Defendants, SELLERS PLAYBOOK, INC, JESSIE C. TIEVA and MATTHEW R. TIEVA with violating the FTC Act, the Business Opportunity Rule, the Minnesota Prevention of Consumer Fraud Act, the Minnesota Uniform Deceptive Trade Practices Act and the Consumer Review Fairness Act.

51.   That, unfortunately for Plaintiff, these wrongful acts have been transpiring for some time and was not disclosed to them at the time of contracting nor was the FTC investigation disclosed.

52.   That upon information and belief, all Defendants benefitted from the advance payment and funds were used for personal purposes and were wrongfully diverted to other endeavors and Defendants.

**FIRST CAUSE OF ACTION**
**(Declaratory Relief)**

53.   Plaintiffs hereby repeat, re-allege and incorporate by this reference the allegations set forth in paragraphs 1 through 52, above, as though fully set forth herein.

54.   That a justiciable controversy exists between Plaintiff and Defendants as to the conduct of the Defendants in orchestrating a scheme to obtain an advance payment from Plaintiff for personal gain in an effort to economically harm the Plaintiff without reason or justification.

9

55.  That a specific controversy is the Defendant(s)' violation of the laws of Minnesota and their violations of statutes as is set forth in the Complaint of the Minnesota Attorney General.

56.  That there are funds of NCH which NCH desires to have returned and NCH seeks to rescind the contract and/or agreement.

57.  Additionally, upon information and belief, Defendants have taken the advanced funds and have used the same for personal gain and Plaintiff is concerned they will continue to deplete those funds for wrongful purposes.

58.  That upon information and belief, all Defendants conspired together to obtain the advanced funds, in order to utilize the funds for their personal profit and to the detriment and harm of the Plaintiff.

59.  Plaintiffs have a legally protectable interest in the controversy, the advanced funds and desire to protect their interests.

60.  That the issue is ripe for judicial determination because, *inter alia,* it presents an existing controversy as to the Parties' rights to the property and obligations at issue herein.

61.  That there is no question that Defendants wrongfully obtained the advanced funds through the use of fraudulent tactic, deceptive tactics and misinformation and have used the funds for profit and have engaged in a concerted effort to harm and damage NCH.

62.  That accordingly, Plaintiff is entitled to a declaratory judgment under the Uniform Declaratory Judgments Act, NRS 30.010 *et seq.,* finding that Defendants are in violation of the law.

63.  That Plaintiff has been required to retain the services of an attorney to prosecute this action, and Plaintiff is therefore entitled to recover his reasonable attorney's fees and costs of court for having to bring this action.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

64. Plaintiffs hereby repeat, re-allege and incorporate by this reference the allegations set forth in paragraphs 1 through 63 above, as though fully set forth herein.

65. That the parties signed an agreement on April 24, 2018.

66. That the agreement specifically provided that NCH would provide the Defendants with a one million ($1,000,000) dollar advance or prepayment to be recouped in referrals and leads from Defendant, SELLERS PLAYBOOK, INC.

67. That NCH were to receive the referral and leads and thereafter would provide services which would in turn repay the advance with proceeds from referrals.

68. That Defendants were obligated to proffer and provide the referrals to NCH in order to obtain the funds from the prepayment.

69. That Defendants breached the agreement when SELLERS PLAYBOOK was shut down and have not contacted NCH.

70. That Defendants ceased sending referrals and leads as is required by the twenty-four (24) month agreement.

71. That Defendant, JESSE C. TIEVA and Defendant MATTHEW R. TIEVA knew or should have known that they would not be able to perform on the contract given the investigation and their wrongful business practices.

72. That, upon information and belief, at the time of the signing of the agreement, Defendants knew, or should have known they were under investigation by the FTC.

73. That Defendants failed to disclose the investigation to NCH prior to signing the agreement.

74. That, but for the failure to disclose, this agreement would not have been executed and the advance would not have been made and would never have been made.

11

75.   Had Defendants disclosed that the Minnesota Attorney General's Office had them under investigation for fraudulent and apparently illegal activities, the advance would never have been made.

76.   That due to a pre-existing relationship, Defendants had a duty to disclose these investigations to Plaintiff.

77.   That Defendants knew or should have known that NCH would be damaged by the breach and that their failure to pay and perform would cause economic harm to NCH.

78.   That preliminary injunctive relief is sought to prevent further dissemination or waste of the funds by the Defendants.

79.   That it would appear from the Complaint filed by the FTC and the Minnesota Attorney General that some of the activities of the Defendants may be criminal in nature.

80.   That Defendants have shut down all operations, their website is not online, their emails are not working and their phone number 1-800-919-2298 is not in service.

81.   That Plaintiff attempted to contact the Defendants but numbers are not in service and emails are not operational.

82.   That Defendants have breached the agreement and have failed to return the advance or provide any explanation for their breach.

83.   That Plaintiffs have been required to retain the services of an attorney to prosecute this action, and Plaintiff is therefore entitled to recover his reasonable attorney's fees and costs of court for having to bring this action.

### THIRD CAUSE OF ACTION
**(Fraud and Fraud in the Inducement)**

84.   Plaintiffs hereby repeat, re-allege and incorporate by this reference the allegations set forth in paragraphs 1 through 83, above, as though fully set forth herein.

12

85. That Defendant, MATTHEW R. TIEVA and Defendant, JESSIE C. TIEVA specifically negotiated with NCH to obtain an advance and did so in bad faith and for fraudulent purposes.

86. That at the time of the negotiation, neither MATTHEW R. TIEVA nor JESSIE C. TIEVA disclosed that they were under investigation nor that their businesses were in jeopardy.

87. That Defendant, MATTHEW R. TIEVA and Defendant, JESSIE C. TIEVA misrepresented their financial stability and misrepresented the financial condition of their companies in order to obtain the advanced funds.

88. That Defendant, MATTHEW R. TIEVA and Defendant, JESSIE C. TIEVA represented as part of the bargain that they had a building, 9001 SCIENCE CENTER DRIVE, LLC and a successful and profitable business, NORTHERN MECHANICAL CONTRACTORS, INC. which they represented to be highly successful in an effort to induce NCH to tender prepayment for referrals.

89. That NCH relied upon their representations in prepaying for leads.

90. That on or about April 15, 2018, Defendant, MATTHEW R. TIEVA and Defendant, JESSIE C. TIEVA failed to disclose the pending investigation and intended to induce NCH to make the advance, knowing they were not financially viable.

91. That Defendant, MATTHEW R. TIEVA and Defendant, JESSIE C. TIEVA received the funds, based upon their individual misrepresentations and used the same to pay personal debts and to enrich themselves and the other Defendants.

92. That at the time of the representations by Defendant, MATTHEW R. TIEVA and Defendant, JESSIE C. TIEVA, both knew their representations were false and misleading.

93.   That Defendant, MATTHEW R. TIEVA and Defendant, JESSIE C. TIEVA did not intend to repay the advance rather, they intended to keep the funds for their personal use and did not intend to fulfill the terms of the contract.

94.   That the sole purpose of the agreement was to obtain funds for Defendant, MATTHEW R. TIEVA and Defendant, JESSIE C. TIEVA through fraudulent and deceptive purposes.

95.   That, upon information and belief, Defendant, MATTHEW R. TIEVA and Defendant, JESSIE C. TIEVA diverted funds to co-defendants, SELLERS ONLINE, NORTHLAND MECHANICAL CONTRACTORS, INC., NORTHLAND MECHANICAL SERVICES, NORTHLAND MECHANICAL SOLUTIONS, SCIENCE CENTER DRIVE, LLC, and/or EXPOSURE MARKETING COMPANY without the knowledge or permission of NCH all to their benefit and did not use the funds for the benefit of Defendant, SELLERS PLAYBOOK.

96.   That NCH has been damaged as a result of the fraud and the fraud in the inducement to an amount to be determined at trial.

97.   That NCH has been forced to retain the services of an attorney and should be compensated for the same.

## FOURTH CAUSE OF ACTION
### (Injunctive Relief)

98.   NCH hereby repeats, re-alleges and incorporates by this reference the allegations set forth in paragraphs 1 through 97 above, as though fully set forth herein.

99.   That Plaintiff's funds are at risk and they have a substantial interest in protecting the same.

100.  That a Court Order is necessary to prevent the further use and dissemination of information and the funds for wrongful purposes and to force Defendants to discontinue their spending of the advanced funds.

101.   That a Court Order is required to stop the wrongful actions of the Defendants, and each of them, as they are causing eminent and permanent damage to NCH.

102.   That Plaintiff has been required to retain the services of an attorney to prosecute this action, and Plaintiff is therefore entitled to recover their reasonable attorney's fees and costs of court for having to bring this action.

### FIFTH CAUSE OF ACTION
(Corporate Theft)

103.   NCH repeats and re-alleges and incorporates by this reference the allegations set forth in paragraphs 1 through 102, above, as though fully set forth herein.

104.   That Defendants, while in an affiliate position and without permission, received an advance and distributed the same to the remaining Defendants for their personal gain and profit.

105.   That the acquisition of the prepayment funds through fraudulent and deceptive conduct was without permission and against the wishes of NCH and is a commission of a taking and a theft while in a fiduciary role as a business affiliate.

106.   That, as a direct and proximate result of Defendants' wrongful actions, NCH has incurred and continues to incur costs and expenses including, but not limited to, lost profits, irreparable damage, litigation costs, attorney fees and consultant fees in connection with this Complaint as well as general damages of NCH and future damages as will be shown according to proof at the time of trial of this matter but alleged to be in excess of $15,000.00.

107.   That NCH will seek recovery of its attorney fees and costs as a result the corporate theft and fraudulent activities of the Defendants and each of them.

////
////

## SIXTH CAUSE OF ACTION
### (Fraud: Intentional Misrepresentation)

108.    That Plaintiff hereby repeats, realleges and incorporates by this reference the allegations set forth in paragraphs 1 through 107, above, as though fully set forth herein.

109.    That prior to April 24, 2018, Defendant JESSIE C. TIEVA had been involved with a similar scheme and was involved in an FTC investigation with FBA Stores.

110.    That, pursuant to the complaint of the Minnesota Attorney General's Office, the Defendants were engaged in a scheme, identical or nearly identical to that of the FBA Stores matter, wherein they were engaging in fraudulent and unfair business practices ultimately concluding in FBA Stores being shut down by the FTC in March of 2018.

111.    That in and around April 24, 2018, Defendants knew they were under investigation by the FTC and that FBA Stores had been shut down the month prior and that a complaint was forthcoming but failed to disclose the same.

112.    That there had been a prior relationship between the parties and NCH was justified in relying upon the misrepresentations of Defendants.

113.    That on April 24, 2018, Defendant, MATTHEW R. TIEVA executed a Lead Generation Agreement with NCH and received funds.

114.    That at that time, MATTHEW R. TIEVA intentionally misrepresented the financial condition of SELLERS PLAYBOOK and SELLERS ONLINE and intentionally failed to disclose the FTC investigation of the FBA Stores matter and SELLERS PLAYBOOK and intentionally misrepresented the operations of SELLERS PLAYBOOK.

115.    That Defendant, JESSIE C. TIEVA knew about the FTC investigation and intentionally misrepresented that NCH would be paid, knowing there was an

investigation was pending and knowing the wrongful activities of the Defendants would lead to their shut down.

116. That, upon information and belief, Defendants JESSIE C. TIEVA and MATTHEW R. TIEVA knew their activities were fraudulent and that criminal conduct could potentially be charged by themselves and their use of the other Defendants and committed fraud by intentionally misrepresenting the status and condition of all defendants and their business practices to NCH.

117. That Defendants, JESSIE C. TIEVA and MATTHEW R. TIEVA, and both of them had the advantage of knowing their business practices were identical to FBA Stores, that FBA Stores had been shut down for unfair business practices, that their practices were violating the unfair business practices law because they were identical to FBA Stores and knew they and SELLERS PLAYBOOK were under investigation for the very same violations by the FTC and received the funds with no intention of performing on the Agreement.

118. That Defendants JESSIE C. TIEVA and MATTHEW R. TIEVA, or their alter egos, Defendants, SELLERS ONLINE, SELLERS PLAYBOOK, NORTHERN MECHANICAL CONTRACTORS, NORTHERN MECHANICAL SOLUTIONS, NORTHERN MECHANICAL SERVICES, NORTHERN MECHANICAL, EXPOSURE MARKETING, SCIENCE CENTER DRIVE, LLC were unjustly compensated by receiving advanced funds.

119. That NCH has been deprived of great sums of money and time all to the benefit of Defendants, and each of them.

120. That NCH has been damaged by the breach, and intentional misrepresentation.

121. That, as a direct and proximate result of Defendants, and each of them, NCH has

incurred and continues to incur costs and expenses including, but not limited to, lost

profits, irreparable damage, litigation costs, attorney fees and consultant fees in

connection with this Complaint as well as general damages of NCH as will be shown

according to proof at the time of trial of this matter but alleged to be in excess of

$15,000.00.

122.   That Plaintiff has been required to retain the services of an attorney to prosecute this

action, and Plaintiff is entitled to recover its reasonable attorney's fees and costs of

court without having to bring this action.

### SEVENTH CAUSE OF ACTION
### (Civil Conspiracy)

123.   That Plaintiff hereby repeats, realleges and incorporates by this reference the

allegations set forth in paragraphs 1 through 122, above, as though fully set forth

herein.

124.   That Defendants, in combination of one with another acted to obtain the advance

proceeds from the Plaintiff and to utilize the information for their personal gain and

profit.

125.   That the Defendants, and each of them, acted in concert or in a concerted action with

the intention of causing harm to Plaintiff.

126.   That the Defendants acted and operated as a common enterprise, conducting business

practices through an interrelated network of companies, having a unified common

ownership, officers, managers, business functions, facilities and office locations such

that it is impossible to separate the common interests of each Defendant.

127.   That Defendants, JESSIE C. TIEVA and MATTHEW R. TIEVA have formulated,

directed, controlled, had authority to control, or participated in the acts and practices of

all Defendants constituting the common enterprise.

18

128.   That the Defendants conspired to obtain the advance proceeds by setting up a mutual

office at 9001 Science Center Drive, New Hope, Minnesota 55428 and paid rents to

themselves and may payments to themselves to dispose of personal debts and other

benefits and profit thereby harming NCH.

129.   Upon information and belief, Defendants have diverted funds to each of the individual

defendants and potentially others in violation of the agreement.

130.   That Plaintiff has been damaged as a result of the conspiracy of the Defendants, and

each of them in an amount in excess of $15,000.00.

131.   That Plaintiff has been required to retain the services of an attorney to prosecute this

action, and Plaintiff is entitled to recover their reasonable attorney's fees and costs of

court without having to bring this action.

## EIGHTH CAUSE OF ACTION
### (Alter Ego)

132.   That Plaintiff hereby repeats, realleges and incorporates by this reference the

allegations set forth in paragraphs 1 through 133, above, as though fully set forth

herein.

133.   That Defendant, MATTHEW R. TIEVA, on behalf of his wife and business partner,

Defendant, JESSIE C. TIEVA executed a Lead Agreement, on or about, April 24, 2018.

134.   That the agreement provided that SELLERS PLAYBOOK would provide referrals at a

discounted rate and other benefits in exchange for an advance and it was anticipated

that the advance would be entirely compensated within twenty-four (24) months.

135.   That Defendants, SELLERS PLAYBOOK, SELLERS ONLINE, NORTHERN

MECHANICAL CONTRACTORS, NORTHERN MECHANICAL SOLUTIONS,

NORTHERN MECHANICAL SERVICES, NORTHERN MECHANICAL,

EXPOSURE MARKETING, SCIENCE CENTER DRIVE, LLC are all alter egos of

19

Defendants, JESSIE C. TIEVA and MATTHEW R. TIEVA as all entities share the same corporate addresses, phone numbers, facsimile number, address, etc.

136.   That the foregoing Defendants, and each of them, have a unity of interest, including business practices, advertising practices, marketing practices, common ownership, officers, managers, business functions, employees, warehouse locations and office locations and have developed a network of interrelated companies such that there is no division in the commonality of interests.

137.   That all corporate, trade name, assume name Defendants are influenced and governed by the remaining Defendants, JESSIE C. TIEVA and MATTHEW R. TIEVA in their entirety such that the interrelated network of Defendants is formulated, directed, controlled exclusively by JESSIE C. TIEVA and MATTHEW R. TIEVA.

138.   That there is a unity of interest and ownership of all Defendants such that any entity is inseparable from Defendants, JESSIE C. TIEVA and MATTHEW R. TIEVA

139.   That SELLERS PLAYBOOK, SELLERS ONLINE, NORTHERN MECHANICAL CONTRACTORS, NORTHERN MECHANICAL SOLUTIONS, NORTHERN MECHANICAL SERVICES, NORTHERN MECHANICAL, EXPOSURE MARKETING, SCIENCE CENTER DRIVE, LLC are all alter egos, or legal fictions of Defendants, JESSIE C. TIEVA and MATTHEW R. TIEVA to the extent that adherence to the belief that they are separate entities would, under the circumstances, sanction a fraud or promote substantial injustice to NCH.

### NINTH CAUSE OF ACTION
#### (Unjust Enrichment)

140.   That Plaintiff hereby repeats, realleges and incorporates by this reference the allegations set forth in paragraphs 1 through 139, above, as though fully set forth herein.

20

141.   That should the Court fail to find or acknowledge an enforceable agreement by and between the Defendants and NCH unjust enrichment is pled, in the alternative.

142.   That based upon the agreement, NCH advanced funds for the purchase and Defendants failed to perform.

143.   That Defendants, and each of them, are in possession of NCH's funds and have been unjustly enriched by not performing.

144.   That Defendants' representations that they would provide the leads and their misrepresentations have been economically detrimental to NCH.

145.   That additionally due to the wrongful actions of Defendants, many potential customers of NCH have requested refunds which is causing additional economic damages to NCH.

146.   That Defendants have accepted the advanced funds and have been economically enriched and have benefitted at the expense and damage to NCH.

147.   That NCH has been damaged in an amount exceeding $15,000 which will be determined at trial.

148.   That Plaintiff has been required to retain the services of an attorney to prosecute this action, and Plaintiffs are entitled to recover his reasonable attorney's fees and costs of court without having to bring this action.

**TENTH CAUSE OF ACTION**
**(Breach of Implied Covenant of Good Faith & Fair Dealing)**

149.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 148 as though fully set forth herein.

150.   That Defendants' promises and representations to Plaintiff acted as an inducement to enter into a contractual agreement.

151.   That prior to the agreement, there had been a working relationship between the parties.

However, NCH was unaware of the business practices of the Defendants and Defendants failed to disclose their common scheme of formulating, planning, directing and controlling deceptive trade practices.

152.    Unbeknownst to NCH, Defendant, JESSIE C. TIEVA had been involved in another online marketing scheme with FBA Stores which had been shut down in March of 2018 nor that she had been involved in *FTC v. AWS, LLC et al.*, Case No. 2:18-cv-00442-JCM-PAL (D. Nev. Filed March 12, 2018) (ECF No. 1).

153.    That Plaintiff relying upon the representations accepted the offer and tendered the sum of funds to the Defendants as was requested.

154.    That Defendants promised to provide the referrals and leads to eventually make NCH whole from their advance pursuant to the Agreement and the inducement to enter into the agreement.

155.    That Plaintiff fully performed on the agreement.

156.    That parties to an agreement have the obligation to deal fairly with one another and Plaintiff anticipated that the Defendants would deal with them fairly and in good faith.

157.    That Defendants breached the covenant of good faith and fair dealing and did not deal openly or honestly with Plaintiff and took advantage of Plaintiff, soliciting funds knowing they were under investigation and would never perform on the agreement.

158.    That due to the breach of the covenant of good faith and fair dealing, NCH was damaged in an amount in excess of fifteen thousand ($15,000.00) dollars.

159.    That due to the breach of good faith and fair dealing, Plaintiff's reliance on the false representations of the Defendants, and each of them, have caused NCH to incur great losses, not only principal, interest and peace of mind but they have been subject to refunds and lost profits.

160. That due to the breach of the implied covenant of good faith and fair dealing, NCH was forced to engage the services of an attorney to prosecute this matter and requests he be reimbursed for the expenditure.

### ELEVENTH CAUSE OF ACTION
#### (Fraud: Promise Without the Intent to Perform)

161. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 160 as though fully set forth herein.

162. Defendants promised NCH to provide referrals in exchange for advanced funds or prepayment.

163. That at the time of the promise, Defendants knew or should have known that the FTC investigation would result in their operation being shut down.

164. That based upon their improper conduct, Defendants knew or should have known that they would never be able to perform on the agreement in that they would not be able to be around for twenty-four (24) months and had no intention or performing the agreement at the time of its execution on April 24, 2018.

165. That NCH entered into the agreement in good faith and was unaware that Defendants did not have the intention to perform on their promise.

166. That based upon the promises, NCH prepaid sums and were justified in their reliance on the representations.

167. That as a result of the false promises and NCH's reliance thereupon, NCH has sustained damages in an amount in excess of $15,000.00.

168. That due to the fraud on the part of the Defendants, NCH was forced to engage the services of an attorney to prosecute this matter and requests he be reimbursed for the expenditure.

////

## TWELTH CAUSE OF ACTION
### (Negligence)

169.    That Plaintiff hereby repeats, realleges and incorporates by this reference the allegations set forth in paragraphs 1 through 168, above, as though fully set forth herein.

170.    That Defendants, and each of them, owed a duty of care to NCH.

171.    That Defendants negligently breached that duty of care by failing or omitting to disclose prior investigations and Federal Cases and ongoing investigations by the FTC to NCH.

172.    That Defendants were negligent in their business practices and mismanaged their businesses to the degree that they ultimately shut down by the FTC and the Minnesota Attorney General's Office.

173.    That the negligence of Defendants was the legal and proximate cause of damages to the Plaintiff by depriving NCH of their funds and/or the referrals.

174.    That NCH has been damaged by the negligence of the Defendants, and each of them.

175.    That as a result of the negligence of the Defendants, NCH has sustained damages in an amount in excess of $15,000.00.

176.    That due to the negligence on the part of the Defendants, NCH was forced to engage the services of an attorney to prosecute this matter and requests he be reimbursed for the expenditure.

## THIRTEENTH CAUSE OF ACTION
### (Punitive Damages)

177.    That Plaintiff hereby repeats, realleges and incorporates by this reference the allegations set forth in paragraphs 1 through 176, above, as though fully set forth herein.

24

178.   That the actions of the Defendants were done with malice and indifference toward the Plaintiff and were intended to or were so recklessly undertaken so as to cause substantial damage to Plaintiff.

179.   That the violations of the subject Agreement are egregious and were committed knowingly and intentionally, all to the detriment of NCH.

180.   That the actions are egregious and justify an award of punitive damages.

181.   That Plaintiff has been required to retain the services of an attorney to prosecute this action, and Plaintiffs are entitled to recover his reasonable attorney's fees and costs of court without having to bring this action.

WHEREFORE, Plaintiff prays that this Court:

1.   Find for Plaintiff and against all Defendants on all causes of action;

2.   Award general damages in favor of Plaintiff and against Defendants in an amount to be determined at trial, in excess of $15,000.00;

3.   Award special damages in favor of Plaintiff and against Defendants in an amount to be determined at trial, in excess of $15,000.00;

4.   For an award of punitive damages;

5.   Award reasonable attorney's fees, costs of suit and pre-judgment interest in favor of Plaintiff and against Defendants;

6.   Award and issue injunctive relief as may be necessary to avert any future damages and injury to Plaintiff;

////

////

////

////

25

7.     Award such other relief as this Court deems just and proper in this matter.

DATED this _11th_ day of August, 2018.

KURT K. HARRIS, ESQ., P.C.

Kurt Harris, Esq.
Nevada Bar No. 5784
4730 S. Fort Apache Rd., Ste. 300
Las Vegas, Nevada 89147
*Attorney for NEVADA CORPORATE*
*HEADQUARTERS, INC.*

**IAFD**
Kurt K. Harris, Esq.
Nevada Bar No.:  5354
4730 S. Fort Apache Rd., Ste. 300
Las Vegas, Nevada 89147
Tele:   (702) 252.3838

Attorney for Plaintiff,
Nevada Corporate Headquarters, Inc.

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

NEVADA CORPORATE HEADQUARTERS,
INC., a Nevada corporation,

              Plaintiff,

vs.

SELLERS PLAYBOOK, INC., a Minnesota
Corporation; MATTHEW R. TIEVA, an
individual; JESSIE C. TIEVA, an individual;
SELLERS ONLINE, assumed name;
SELLERS SYSTEMS, assumed name
NORTHLAND MECHANICAL CONTRACTORS,
INC., a Minnesota Corporation; a/k/a
NORTHLAND MECHANICAL SERVICES; a/k/a
NORTHLAND MECHANICAL SOLUTIONS;
SCIENCE CENTER DRIVE, LLC; a Minnesota
Limited Liability Company; EXPOSURE
MARKETING COMPANY, a Minnesota Company;
 DOES I through X and ROE Corporations or
Business Entities I through X, inclusive,

              Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.: A-18-779579-C

DEPT NO.: 31

**INITIAL APPEARANCE FEE DISCLOSURE (NRS CHAPTER 19)**

    Pursuant to NRS Chapter 19, as amended by Senate Bill 106, filing fees are submitted

for parties appearing in the above entitled action as indicated below:

    Defendant, NEVADA CORPORATE HEADQUARTERS, INC.       $270.00

HARRIS LAW OFFICE
4730 S. FORT APACHE RD., STE. 300
LAS VEGAS, NEVADA 89147

TOTAL REMITTED:                                                    $270.00

DATED this 17st day of August, 2018.

**HARRIS LAW OFFICE**

**KURT K. HARRIS, ESQ.**
Nevada Bar No. 5354
4730 S. Fort Apache Rd., Ste. 300
Las Vegas, Nevada 89147
Attorney for NEVADA CORPORATE
HEADQUARTERS, INC. and  AJ VALLE

21 011 pleadings/002 IAFD

2

Electronically Filed
8/30/2018 2:46 PM
Steven D. Grierson
CLERK OF THE COURT

**APPL**
**KURT K. HARRIS, ESQ.**
Nevada Bar No. 5354
4730 S. Fort Apache Rd., Suite 300
Las Vegas, Nevada 89147
(702) 252-3838
(702) 852.0337 Facsimile

Attorney for Plaintiff,
Nevada Corporate Headquarters, Inc.

## DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| NEVADA CORPORATE HEADQUARTERS, INC., a Nevada corporation, <br><br> Plaintiff, <br><br> vs. <br><br> SELLERS PLAYBOOK, INC., a Minnesota Corporation; MATTHEW R. TIEVA, an individual; JESSIE C. TIEVA, an individual; SELLERS ONLINE, assumed name; SELLERS SYSTEMS, assumed name NORTHLAND MECHANICAL CONTRACTORS, INC., a Minnesota Corporation; a/k/a NORTHLAND MECHANICAL SERVICES; a/k/a NORTHLAND MECHANICAL SOLUTIONS; SCIENCE CENTER DRIVE, LLC; a Minnesota Limited Liability Company; EXPOSURE MARKETING COMPANY, a Minnesota Company) DOES I through X and ROE Corporations or Business Entities I through X, inclusive, <br><br> Defendants. | CASE NO.:  A-18-779579-C <br><br> DEPT NO.:  31 |

## APPLICATION FOR TEMPORARY RESTRAINING ORDER

COMES NOW the Plaintiff, NEVADA CORPORATE HEADQUARTERS, INC., a Nevada

Corporation, (hereinafter "NCH"), by and though its attorney of record, Kurt Harris, Esq., P.C., and

hereby files this Application for Temporary Restraining Order and hereby moves this Court for an order

enjoining and restraining Defendants from future disbursing and utilizing funds and maintaining the

same in a blocked account as follows:

1

This Application is made pursuant to NRCP 65(a) and NRS 33.010 and is based on the pleadings and papers on file herein, the following Points and Authorities, the Affidavit of Counsel and any oral argument that may be made at the time of the hearing in this matter.

DATED this 28th day of August, 2018.

**KURT K. HARRIS, ESQ., P.C.**

KURT K. HARRIS, ESQ.
Nevada Bar No. 5354
4730 S. Fort Apache Rd., Suite 300
Las Vegas, Nevada 89147
(702) 252-3838
(702) 405-2465 Facsimile

## **NOTICE OF MOTION**

TO:    Plaintiff, above-named.

PLEASE TAKE NOTICE the undersigned will bring the foregoing Motion and Application on for hearing on the 02 day of October , 2018, at 9:00 A . m., or as soon thereafter as counsel may be heard.

DATED this 28th day of August, 2018.

**KURT K. HARRIS, ESQ., P.C.**

Kurt Harris, Esq.
Nevada Bar No. 5354
4730 S. Fort Apache Rd., Ste. #300
Las Vegas, Nevada 89147
Attorney for Nevada Corporate Headquarters, Inc.

2

## AFFIDAVIT OF KURT K. HARRIS, ESQ.
## IN SUPPORT OF APPLICATION FOR INJUNCTIVE RELIEF

STATE OF NEVADA              )
                            ) ss:
COUNTY OF CLARK              )

I, KURT K. HARRIS, having be duly sworn, hereby states as follows:

1. I am an attorney licensed to practice law in all Courts in the State of Nevada, the State of Utah, the Ninth Circuit Court, the Federal District Court of Nevada and the United States Supreme Court and represent Plaintiff, NEVADA CORPORATE HEADQUARTERS, INC. in the instant action.

2. That the instant action is brought to obtain a temporary injunction restraining the Defendants from further spending or utilizing prepaid funds.

3. That it has been brought to my attention that some of the Defendants are under federal and state investigation, specifically, the Federal Trade Commission (FTC) and the State of Minnesota Attorney General's Office.

4. Based upon the complaint of the Minnesota Attorney General's Office, the Utah Consumer Protection Agency and the State of South Dakota were additionally involved in initiating the investigation.

5. That it is believed that Defendants are currently holding funds of Plaintiff and Plaintiff seeks to protect those funds by ordering Defendants to place the funds with the Court or in a blocked account.

6. That NEVADA CORPORATE HEADQUARTERS, Inc. realizes there are other governmental entities involved and does not seek to set aside any of their actions. The desire is to protect and to preserve the funds of NCH which were prepaid for services which were not and will not be received.

3

7. In order to avoid irreparable harm, NCH seeks to have the matter heard on an order shortening time as there is little recourse available for them at this time while investigations are pending.

8. Upon information and belief, the Attorney General of Minnesota has set a hearing for injunctive relief to be heard on August 13, 2018.

9. Upon information and belief, on August 20, 2018, Defendant, MATTHEW TIEVA brought police to his home, after he threatened suicide.

10. Plymouth police responded and SWAT was called to make entry into the home as TIEVA was armed.

11. At some point, MATTHEW TIEVA found his way out of the house and was apprehended while he was lying down in the street and he was taken to North Memorial Medical Center for observation.

12. That on August 28, 2018, Defendant, MATTHEW TIEVA called my office and requested my email address, acknowledging that he had received service of process of the instant suit.

13. That this Application is not brought for any improper purpose or for delay but rather to protect and to preserve the rights of NEVADA CORPORATE HEADQUARTERS, INC.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

DATED this 29th day of August, 2018.



KURT HARRIS, ESQ.

SUBSCRIBED and SWORN to
this 29th day of August, 2018

NOTARY PUBLIC in and for
said County and State

SHANISHA L. DOYLE
NOTARY PUBLIC
STATE OF NEVADA
My Commission Expires: 02-12-20
Certificate No: 08-6533-1

4

## POINTS AND AUTHORITIES

### I.  INTRODUCTION

NEVADA CORPORATE HEADQUARTERS, INC. (NCH) is a Nevada corporation doing business in the State of Nevada and employing approximately 100 employees.  NCH provides a variety of services to individuals and is a resident agent in the State of Nevada.  NCH is provided referrals from various sources.  At times, NCH may purchase qualified referrals, of individuals who are seeking their services, from other persons or companies.

In the case at bar, on April 24, 2018, the parties executed a contract to provide qualified leads and/or referrals from SELLERS PLAYBOOK to NCH.  (*Exhibit 1*).  SELLERS PLAYBOOK was previously in business for providing information and seminars to the public for the operation of online stores in connection with Amazon.com.  SELLERS PLAYBOOK

At the time of contracting, Defendants, JESSIE TIEVA and MATTHEW TIEVA misrepresented the financial condition of their companies and failed to provide NCH with the information about the investigations and/or pending complaints.  Had Defendants been forthright with NCH, the contract would not have been drafted.  The lack of candor provided the basis for the bargain.

The contract noted that NCH would provide a one million dollar prepayment or advance of funds for the purchase and in exchange, Defendants would provide NCH with referrals for twenty-four months.  Ordinarily, leads were purchased at a certain sum.  Under the new agreement, leads would be discounted for twenty-four (24) months.  It was anticipated and represented by the Defendants that NCH would be repaid and thereafter would profit substantially from the prepayment.  Defendants received the funds in full and approximately 90 days later were shut down and breached the agreement.

It is believed that each and every one of the defendants profited in some way from the proceeds and that portions of the proceeds were disbursed to each.  Plaintiffs seek an order enjoining the continuing

efforts of Defendants.  An order is requested enjoining Defendants from contacting Plaintiffs' clients and the solicitation of the same and further depletion of Plaintiffs' resources and relationships.

## II.   FACTS

NEVADA CORPORATE HEADQUARTERS, INC. (NCH) has its principal place of business in Nevada and has offices in Las Vegas and Reno, Nevada.  NCH facilitates incorporations in Nevada and provides resident agent services.  They had a working, affiliate type, relationship with a company, Defendant, SELLERS PLAYBOOK, INC.  That company was commenced in 2017 and is a Minnesota Corporation.  The principal place of business is SELLERS PLAYBOOK is 9001 Science Center Drive, New Hope, Minnesota 55428, however, their online services were intended for a nationwide market. Much of that working relationship was based upon MATTHEW TIEVA's representation that he had a successful HVAC company backing SELLERS PLAYBOOK.    That Company is Defendant, NORTHLAND MECHANICAL CONTRACTORS.

Defendant, JESSIE C. TIEVA represented that she worked for a company which provided similar services in 2017.  That company was FBA Stores, which was known to JESSIE TIEVA and others as "Fulfilled By Amazon Stores".  This abbreviation meaning was recently discovered by NCH and is concerning given the complete lack of affiliation of FBA Stores or SELLERS PLAYBOOK with Amazon.com.  Defendants failed to disclose to NCH that FBA Stores was raided and shut down by the FTC in March of 2018.  That information would have prevented the execution of the instant Agreement.

JESSIE TIEVA left FBA Stores and started a copycat online business with her husband, MATTHEW TIEVA.  Part of the business was to be promoted by EXPOSURE MARKETING COMPANY, a wholly owned company of the Defendants with its principal place of business located at 5290 Black Oaks Lane North, Plymouth, Minnesota 55446.  This address is additionally listed as the home address for Defendants, JESSIE TIEVA and MATTHEW TIEVA.

NCH did business with SELLERS PLAYBOOK, INC., obtaining customer referrals for a fee. Defendants, SELLERS PLAYBOOK and MATTHEW TIEVA requested assistance of NCH in reviewing their website. In March of 2018, FBA Stores was shut down by the FTC. Thereafter, in March of 2018, JESSIE TIEVA and MATTHEW TIEVA approached NCH about advancing the sales of referrals. This fact was not disclosed to NCH. As part of the inducement to enter into the Agreement, MATTHEW TIEVA represented that he had a very successful Heating/Plumbing and Mechanical Company, which happens to have the same address as SELLERS PLAYBOOK and the representation was that their business model was stable and solid.

Based upon the inducements of MATTHEW TIEVA and JESSIE TIEVA, the alleged success of JESSIE TIEVA with FBA Stores, the successful HVAC business and real estate holdings, including a building, the parties entered into an agreement that set forth that NCH would advance funds to SELLERS PLAYBOOK, INC. as a prepayment for referrals and in turn, over the course of the following twenty-four (24) months, referrals would be provided to NCH at a discounted rate.

Upon information and belief, NCH believes that some of the advance was diverted to NORTHLAND MECHANICAL CONTRACTORS, INC., due to the unity of interests or the alter ego of Defendants, SELLERS PLAYBOOK, INC., JESSIE TIEVA and MATTHEW TIEVA. NORTHLAND MECHANICAL CONTRACTORS, INC. has a couple of dba's which are NORTHLAND MECHANICAL SOLUTIONS and NORTHLAND MECHANICAL SERVICES. Upon information and belief, funds were diverted to SCIENCE CENTER DRIVE, LLC which is the LLC providing the physical location for most of the Defendants and finally, upon information and belief, MATTHEW TIEVA and JESSIE TIEVA diverted business funds for their personal use and the payment of their mortgage at 5290 Black Oaks Lane North, Plymouth, Minnesota 55446.

At the time of contracting, Defendants knew they were under investigation and did not disclose the same. Defendants additionally knew that FBA Stores had been shut down and that they were next in

line.  Defendants did not disclose any of the forgoing prior to the execution of the agreement on April 24, 2018.  *Exhibit 1*.  It is apparent that Defendants did not have any intention of fulfilling the terms of the agreement, knowing they would not be around in twenty-four (24) months.  With the knowledge Defendants possessed, no reasonable person could anticipate they would not be shut down by the FTC.  Moreover, had they disclosed the facts, NCH would not have entered into the Agreement in April of 2018.

In June 2018, the FBA Stores key operators were banned from selling business opportunities and business coaching services, and required to surrender approximately $10.8 million for return to consumers.  Upon information and belief, JESSIE TIEVA was one of the prior key operators.  On July 30, 2018, the Minnesota Attorney General's Office filed a lawsuit against some of the Defendants.  *Exhibit 2*.  The suit was filed on behalf of Minnesota and the Federal Trade Commission (FTC).  It is inconceivable that Defendants did not disclose this activity to NCH.  Rather than deal appropriately with affiliates, Defendants maintained the information, failing to disclose their conduct.

On August 1, 2018, the FTC raided the offices at 9001 Science Center Drive, disconnecting the phone lines, taking the online operations offline, shutting down webmail and seizing property.  NCH is concerned that their funds have been seized.  That on or about August 6, 2018, the FTC released press information regarding the shut down of the Defendants.  *Exhibit 3*.  Upon information and belief, a hearing on injunctive relief was held on August 13, 2018.  A temporary retraining Order was filed under seal on July 30, 2018 for which the hearing is scheduled.  *Exhibit 4.*

That Defendants have been charged with nine counts in connection with misrepresentations.  The TIEVAS apparently offered marketing mechanisms and conducted seminars designed to sell their programs to become a reseller on Amazons third party platform.  The TIEVAs promoted a business model for selling products on Amazon.com's third-party sales platform.  *Exhibit 5*.  Defendants, SELLERS PLAYBOOK, MATTHEW TIEVA and JESSIE TIEVA made false claims about customer's

ability to make profits selling on Amazon through the use of their program. ***Exhibit 5***. JESSIE TIEVA blamed lazy customers for failing to achieve what she promised. She told TwinCities.com, "Our whole reason for starting this is to help other people become successful. … There are some people out there who think they can get the world handed to them and not work for anything." TwinCities.com/2018/08/06/Plymouth-couple-accused-of-taking-15m-from-customers-in-bogus-amazon-sales-scheme.

That the Temporary Injunctive Order seeks a temporary receiver over the corporate defendants and seeks to freeze assets. The concern is that funds and assets of NCH are contained within that freeze. On August 28, 2018, a warning was received by the undersigned from Defendants' JESSIE and MATTHEW TIEVA's counsel, Carrie Zochert, Esq. ***Exhibit 6***. Ms. Zochert is not a Nevada licensed attorney and a response was sent to her to see if she was going to represent Defendant, and each of them, in the Nevada action. ***Exhibit 7***. No response was received at this time.

NCH does not desire to interfere with the Jurisdiction of the FTC or the Minnesota Attorney General. Specifically, NCH does not want to step onto the toes of any governmental entity, however, their interests are of concern and are in need of protection. NCH has a legally protectable interest. Moreover, as part of their Agreement, NCH agreed to aid and assist in providing services to Defendants. Defendants have not fulfilled the services and as a result, customers are seeking refunds from NCH. The net result of this is that NCH is attempting to avoid paying refunds for funds they never received from Defendants. NCH has rights as well. Equity demands some assistance or extraordinary relief. Upon information and belief, NCH will suffer severe and irreparable damages and injuries in the form of loss of income, loss of the prepayment, lost profits and expectation damages.

### III.   LEGAL STANDARD

NRS 33.010 authorizes injunctive relief "when it shall appear by the complaint that the plaintiff is entitled to the relief demanded, and such relief or any part thereof consists in restraining the

commission or continuance of the act complained of...."   An injunction may be granted when it appears in the complaint that plaintiff is entitled to relief.  NRS 33.010.1.

The Nevada Supreme Court has repeatedly held that an act which destroys or results in a substantial change in property, either physically or in the character in which it has been held or enjoyed, does irreparable injury, and justifies injunctive relief. *Memory Gardens v. Pet Ponderosa*, 88 Nev. 1, 4, 492 P.2d 123, 125 (1972).  Nevada courts have held that a "preliminary injunction is available upon a showing that the party seeking it enjoys a reasonable probability of success on the merits and the Defendant(s)' conduct, if allowed to continue, will result in irreparable harm for which compensatory damages is an inadequate remedy." *SNOBOL v. Capital Management Consultants, Inc.*, 102 Nev. 444, 726 P.2d 35 (1986).  While much of the damages sought are monetary, the fear is that with the involvement of governmental entities and a receiver, it is critical for NCH to preserve their interest in their funds.  Without some action or order, the concern is that governmental entities may not know about NCH's claims and their ownership of the funds.

A party seeking a preliminary injunction must show a likelihood of success on the merits of their case and that they will suffer irreparable harm without preliminary relief. *Clark Cty. Sch. Dist. v. Buchanan*, 112 Nev. 1146, 1150, 924 P.2d 716, 719 (1996). "[This court will only reverse the district court's decision when the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact." *Excellence Cmty. Mgmt., LLC v. Gilmore*, 131 Nev. 347, 351, 351 P.3d 720, 722 (2015) (quoting *Boulder Oaks Cmty. Ass'n v. B & J Andrews Enters., LLC*, 125 Nev. 397, 403, 215 P.3d 27, 31 (2009) (internal quotation marks omitted)). "A decision that lacks support in the form of substantial evidence is arbitrary or capricious and, therefore, an abuse of discretion." *Finkel v. Cashman Prof?, Inc.*, 128 Nev. 68, 72-73, 270 P.3d 1259, 1262 (2012) (quoting *Stratosphere Gaming Corp. v. Las Vegas*, 120 Nev. 523, 528, 96 P.3d 756, 760 (2004) (internal quotation marks omitted)). "An abuse of discretion can occur when the district court bases its decision

on a clearly erroneous factual determination or it disregards controlling law." *MB Am., Inc. v. Alaska Pac. Leasing Co.*, 132 Nev. 78, 88, 367 P.3d 1286, 1292 (2016).

Moreover, due to the unavailability of representatives of Defendants, customers and clients are calling NCH, some requesting refunds.  NCH requires some information or some update or records on clients to have some basic information as to what they were told or what they were promised.  NCH may not have received funds for some of these individuals which is particularly difficult as they are being requested to respond and refund money due to the complete absence of Defendants.   These instances are known as net order wherein SELLERS PLAYBOOK received funds for incorporation for which NCH is anticipated and expected to perform when they were never remitted payment or in other instances, customers want refunds from NCH for funds never tendered to NCH.

Injunctive relief is necessary in the instant action to prevent irreparable harm.  NCH requests that Defendants be enjoined from making further distributions of their funds.  Pursuant to NRS 33.010.3, when it shall appear that the defendant is doing something which harms or threatens to harm to plaintiff, an injunction may be issued.

Generally, injunctive relief is available to an aggrieved party to preserve the status quo where (1) the moving party enjoys a reasonable probability of success on the merits of its claims; and (2) the defendant's conduct, if allowed to continue, will result in irreparable harm for which compensatory damages are an inadequate remedy. *Number One Rent-A-Car v. Ramada Inns*, 94 Nev. 779, 780-81, 587 P.2d 1329, 1330 (1978).

Pursuant to *Roe v. Anderson*, 34 F.3d 1400, 1402 (9th Cir. 1998), the foregoing factors are points on a sliding scale in which the degree of irreparable harm increases as the probability of success increases. There are significant concerns that NCH's business will be negatively affected by the actions and conduct of the Defendants.  The attached documentation conclusively sets forth a probability that NCH

will prevail on the merits.  Due to the fact there is no question of prevailing on the merits, injunctive relief is appropriate.  Moreover, no bond should be required as the funds belong to NCH.

## IV.        ARGUMENT

### A.        Injunctive Relief is Appropriate in Order to Avoid Irreparable Harm

The decision whether to grant a preliminary injunction is within the sound discretion of the District Court.  *Nevada v. NOS Communications, Inc.*, 120 Nev. 65, 84 P.3d 1052, 1053 (2004); *Dangberg Holdings Nevada, LLC v. Douglass County Bd. Of Commissioners*, 115 Nev. 129, 142-143, 978 P.2d 311, 319 (1999).  Plaintiffs seek this injunction in order to prevent Defendants from committing any further unlawful actions and to halt any further depletion of capital and funds.  NCH agrees and acknowledges that there is a current Temporary Restraining Order imposed by the FTC and the State of Minnesota.  However, NCH desires to solidify their position and seeks to protect their interests.

It is well settled that before a court will issue a preliminary injunction, the moving party must show that there is a likelihood of success on the merits and that the nonmoving party's conduct will cause irreparable harm for which there is no adequate remedy at law.  *Department of Conservation & Natural Resources v. Foley*, 109 P.3d 760, 762 (Nev. 2005).  It is believed that the foregoing brief sets forth conclusively that there is a substantial likelihood of success on the merits and that NCH has financial interests and business relationship interests to protect.

Any act which destroys or results in a substantial change in property, either physically or in the character in which it has been held or enjoyed, does irreparable injury, and justified injunctive relief. *Memory Gardens v. Pet Ponderosa*, 88 Nev. 1, 4, 492 P.2d 123, 125 (1972).  Nevada courts have held that even where the adequacy of the remedy at law is unclear, injunctive relief should be granted. *Ripps v. City of Las Vegas*, 72 Nev. 135, 297 P.2d 258 (1956).

There is an established relationship with some clients and customers and to some degree the relationships may be harmed should the injunction not be issued.  "Generally, harm is 'irreparable' if it cannot adequately be remedied by [monetary] damages."  *Hamm v. Arrowcreek*, 183 P.3d 895, 901 (Nev. 2008), citing *Univ. and Cmty. Coll. Sys. Of Nev.*, 100 P.3d at 187.  Monetary relief "fails to provide adequate relief for an interest in real property, which by its very nature is considered unique."  *O'Hagan v. United States*, 86 F.3d 7786, 783 (8th Cir. 1996).  Moreover, courts have held that "[i]f denying an injunction results in eviction, then the irreparable harm element is likely met."  *Sagnarath v. BNC Mortgage, Inc.*, No. 06-3465, 2007 U.S. Dist. LEXIS 28457, at *9 (D.Minn. April 17, 2007), citing, *Higbee v. Starr*, 698 F.2d 945, 947 (8th Cir. 1983).

B.    **Plaintiff is Likely to Succeed on the Merits**

Injunctive relief may be granted if Plaintiff can show a likelihood of success on the merits. *Danberg Holdings*, 155 Nev. at 142, 978 P.2d at 319.  There is no dispute that Defendants are acting in concert in a manner which will cause permanent harm.  Based upon the facts attached hereto and the substantiated complaints of the FTC and the Minnesota Attorney General, it appears that the likelihood of success on the merits will easily be established.

The information attached in the Appendix clearly demonstrates a substantial likelihood of success on the merits.  NCH would like to secure their position, legally and would like to illustrate their genuine concern for the breach of contract by Defendants.  Moreover, it would appear from all evidence that the Defendants are accused of substantial violations and that NCH's concerns are genuine in their effort to halt any potential for depletion of their funds.

V.    **CONCLUSION**

Based upon the above stated law and facts, NEVADA CORPORATE HEADQUARTERS, INC. respectfully requests that this Honorable Court grant its Application for injunctive relief and for a Temporary Restraining Order.  Again, NCH acknowledges that potential that a restraining order may

issue, NCH is not aware of the outcome of the hearing on August 13, 2018.  However, it is critical to protect their interests and an order is sought, which does not supersede any preexisting order, if any.

DATED this 28th day of August, 2018.

**KURT K. HARRIS, ESQ., P.C.**

Kurt Harris, Esq.
Nevada Bar No. 5354
4730 S. Fort Apache Rd., Ste. 300
Las Vegas, Nevada 89147
*Attorney for NEVADA CORPORATE HEADQUARTERS, INC.*

14

Electronically Filed
8/29/2018 10:28 AM
Steven D. Grierson
CLERK OF THE COURT

1  **KURT K. HARRIS, ESQ.**
   Nevada Bar No. 5354
2  4730 S. Fort Apache Rd., Suite 300
   Las Vegas, Nevada 89147
3  (702) 252-3838
   (702) 852.0337 Facsimile
4  Attorney for Plaintiff,
   Nevada Corporate Headquarters, Inc.
5

6

7                        **DISTRICT COURT**

8                   **CLARK COUNTY, NEVADA**

9

10  NEVADA CORPORATE HEADQUARTERS,    )
    INC., a Nevada corporation,       )
11                                    )
              Plaintiff,              )    CASE NO.:  A-18-779579-C
12                                    )
    vs.                               )    DEPT NO.:  31
13                                    )
    SELLERS PLAYBOOK, INC., a Minnesota )
14  Corporation; MATTHEW R. TIEVA, an )
    individual; JESSIE C. TIEVA, an individual; )
15  SELLERS ONLINE, assumed name;     )
    SELLERS SYSTEMS, assumed name     )
16  NORTHLAND MECHANICAL CONTRACTORS,)
    INC., a Minnesota Corporation; a/k/a )
17  NORTHLAND MECHANICAL SERVICES; a/k/a )
    NORTHLAND MECHANICAL SOLUTIONS;  )
18  SCIENCE CENTER DRIVE, LLC; a Minnesota )
    Limited Liability Company; EXPOSURE )
19  MARKETING COMPANY, a Minnesota Company )
    DOES I through X and ROE Corporations or )
20  Business Entities I through X, inclusive, )
                                      )
21            Defendants.             )
    _____ )
22

23         **APPENDIX IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF**

24     EXHIBIT 1    Agreement, dated April 2018;

25     EXHIBIT 2    Complaint for Permanent Injunction;

26     EXHIBIT 3    FTC Release;

27     EXHIBIT 4    Temporary Restraining Order;

28

EXHIBIT 5    News Release, dated August 20, 2018;

EXHIBIT 6    Correspondence from Defendants' Counsel; and,

EXHIBIT 7    Response to Correspondence from Defendants' Counsel.

DATED this 28th day of August, 2018.

KURT K. HARRIS, ESQ.
Nevada Bar No. 5354
4730 S. Fort Apache Rd., Ste. 300
Las Vegas, Nevada 89147
Tele:   (702) 723-9800
Fax:    (702) 852-0337

# Exhibit 1

# SP & NCH AFFILIATE LEAD AGREEMENT

THIS LEAD GENERATION AND ADMINISTRATION AGREEMENT (hereinafter, this Agreement) is made and entered into on this 24th day of April, 2018, and is made effective by and between SELLERS PLAYBOOK, INC., (hereinafter, "SP") having its principal office of business at 9001 Science Center Drive, Minneapolis, Minnesota 55428, and NEVADA CORPORATE HEADQUARTERS, INC., (hereinafter, "NCH"), having its principal office of business at 4730 S. Fort Apache Road, Suite 300, Las Vegas, Nevada 89147.

## Witnessed:

WHEREAS, the parties hereto specifically desire to enter into this agreement for lead rights to their mutual benefit.

WHEREAS, SP desires to provide valid leads for services provided by NCH and desires to direct such leads to NCH in accordance with the terms and condition of this Agreement.

WHEREAS, NCH desires to receive leads and/or referrals of clients or potential clients from SP and SP desires to deliver such leads and/or referrals of clients or potential clients to NCH.

WHEREAS, the duration and term of this agreement is exclusive for twenty-four (24) months. SP agrees to exclusively provide leads to NCH for twenty-four (24) months pursuant to the following terms and conditions.

NOW, THEREFORE, for and in consideration of the mutual covenants and promises hereinafter contained, SP agrees to provide leads to NCH, and NCH agrees to purchase the exclusive rights to leads from SP upon the following terms and conditions.

WITNESSTH THAT, in consideration of the mutual convenance and undertakings hereinafter set forth, the parties hereto agree as follows:

## Agreement:

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties do agree as follows:

**ARTICLE I.** **Exclusivity.** SP agrees and acknowledges to exclusively provide all referenced leads to NCH. The Parties acknowledge that any such referral of clients or potential clients from SP for use by NCH, shall be given solely and exclusively to NCH and shall not be sold, given, referred or provided to any other person, entity or other competitor of NCH or a company providing the same or similar services. NCH agrees to exclusively work with the referenced leads and not to resell or refer the leads to third party providers, not affiliated with

NCH0001

NCH, without such business being specifically agreed on by SP.  Nothing in this provision prohibits SP from providing leads to persons or entities that do not use them to the sell same or similar services as NCH or sell services that are not in competition with those that NCH provides.

**ARTICLE II.**     Purpose.  SP does expressly understand and acknowledge that the sole purpose of its delivery of leads and/or referrals of clients or potential clients to NCH is to permit NCH to utilize such leads and/or referrals of clients or potential clients in its operations and through other various service providers and service companies, owned, operated or affiliated with NCH.  NCH does acknowledge and agree that its use of leads and/or referrals of clients or potential clients from SP under this Agreement shall be limited to its operations under NCH.  In the event that an opportunity to offer new products/services to clients arises, SP will be notified and an addendum to this agreement for product/services will be negotiated and added with consent of both parties.

**ARTICLE III.**     Best Efforts.  The parties hereto agree that they and their employee(s) will use his (their) best efforts to actively promote and increase the sale of the Services and more specifically to reach the forecast set forth.

**ARTICLE IV.**     Compensation/Commission Structure.  Upon execution and completion of this Agreement, the Parties hereto do agree that NCH agrees to pay SP the following compensation and or commissions:

a.   In consideration for the terms and conditions stated in this agreement, NCH agrees pay a leads right fee to SP in the total sum of $1,000,000.00 upon the execution of this agreement.

b.   NCH agrees to pay SP an affiliate commission in the amount of fifteen (15%) percent, to be paid from the Gross Initial and Secondary sales of NCH products sold to SP leads up to ninety (90) days after an initial sale by NCH.

c.   NCH agrees to pay thirty (30%) percent commission on Discounted SP Membership sales.

d.   SP's Commission shall be paid, via wire or ACH transfer, monthly on 15th day of the 3rd month (75 day hold) until NCH hits Gross Sales of $6,500,000.

d.   NCH shall deduct forty (40%) percent hard costs on tax sales from gross.

**Once NCH Gross sales from SP leads exceed $6,500,000, the SP Affiliate Commission Rates will double as follows:**

a.   NCH agrees to pay SP an affiliate commission in the amount of thirty (30%) percent, to be paid from the Gross Initial and Secondary sales of NCH products sold to SP leads for the first ninety (90) days.

b.   NCH agrees to pay sixty (60%) percent commission on SP Membership sales.

c.   SP's Commission shall be paid monthly on 15th day of the following month.  Monthly Payments will be paid via wire or ACH transfer to SP.

d.   NCH shall continue to deduct forty (40%) percent hard costs on tax sales from gross.

NCH0002

Upon the receipt of the leads right fee, pursuant to ARTICLE VI(a), SP agrees to provide all buyer and A.N.B. leads from January 1, 2018 to the date of this agreement and pursuant to the lead release scheduled mentioned herein.

In the event of termination of this Agreement for whatever reason, NCH will honor all commissions owed to SP for Gross Sales received directly by NCH from the customer leads prior to the termination of this Agreement.

**ARTICLE V.**     <u>Indemnification</u>.  Both parties hereby agree to indemnify and hold each other harmless from and against all losses, damages, penalties, fines, forfeitures, legal or other fees, judgments, costs, expenses, debts, obligation and claims which either Party may have or may hereafter suffer, incur, pay or sustain as a result of any false or misleading statements or information provided to either Party by the other.

It is agreed to by and between the parties that SP shall indemnify and defend NCH as against any claims or suits arising from the actions of third parties over which NCH has no control resulting from this agreement.  NCH shall not be liable for any actions which were not undertaken by them within their office or which were not performed at their direction.  NCH shall indemnify and defend SP as against any claims or suits arising from the actions of third parties over which SP has no control resulting from this agreement.  SP shall not be liable for any actions which were not undertaken by them within their office or which were not performed at their direction.

**ARTICLE VI.**     <u>Independent Contractors</u>.  Each Party acknowledges it is an independent contractor and will not represent itself through its actions as an employee or agent of the other Party, and will not conduct its business in a manner that would provide the consumer the impression that it is an agent, employee, or affiliate of the other Party.

**ARTICLE VII.**     <u>Notice of Representations and Warranties</u>.  Each Party does agree that should any of the representations and warranties made by it in this Agreement, or in any instrument delivered in connection herewith, be or become untrue or inaccurate at any time in any material respect, NCH, or SP, as applicable, will provide prompt written notice to the other Party.

**ARTICLE VIII.**     <u>Term</u>.  This Agreement shall commence on the date first above written and shall continue for a period of not less than twenty-four (24) months.  Upon the termination of this Agreement, NCH agrees to continue processing any pending activities through NCH which were submitted by or through leads and/or referrals of clients or potential clients from or through SP prior to the termination date, with all rights and obligations of the Parties with respect to such applications surviving the termination of this Agreement.  Additionally, the representations and warranties of the Parties contained in this Agreement shall survive the termination of this Agreement.  Moreover, NCH reserves the right to immediately terminate this agreement for cause.  "Cause shall bear the following meanings, without any limitation, where SP, or the owners or officers thereof, has:

NCH0003

- Failed to cure, after reasonable notice in writing of not less than thirty (30) days, a material breach of any of the terms of this Agreement;
- Been formally charged with, convicted of, or entered a guilty or no lo contendere plea in a court of competent jurisdiction for any crime which, in the sole and absolute discretion of NCH, adversely affects NCH, which shall involve moral turpitude or be punishable by imprisonment in the jurisdiction involved;
- This Agreement shall be immediately terminated by notice if either party fails or refuses to perform or observe or comply with any of its obligations or conditions under this Agreement.
- Committed any act of fraud or dishonesty including but in no way limited to, falsification of records or misappropriation of funds or any corporate opportunity;
- Filed a voluntary or involuntary petition under the Federal Bankruptcy Code, been deemed insolvent or received the appointment of a receiver or trustee or other such similar circumstances;
- In the event that SP fails to carry out its services hereunder diligently and to the satisfaction of NCH, NCH may terminate this Agreement at any time upon thirty (30) days of written notice to SP; or,
- Committed any act that constitutes a breach of a fiduciary duty and/or a breach of a duty of loyalty.

**ARTICLE IX.**     Terms.   Pursuant to the agreement, SP agrees to exclusively provide the following leads to NCH defined and identified as follows:

- SP agrees to provide NCH with Attendee Non-Buyer Leads (A.N.B.) according to the following terms and conditions:
  - Offer SP Discounted Memberships;
  - Offer Entity, Tax and Business Credit;
  - Leads available within 1 week of events or sooner; and,
  - No maximum sales cap on NCH per lead.

- SP agrees to provide NCH with Buyer Leads (Members) according to the following terms and conditions:
  - Offer Entity, Tax, Business Credit, Business Plans and Trademarks;
  - Leads available once customer has fully paid SP and no later than eight (8) weeks from initial membership purchase, if fully paid; and,
  - Maximum sale cap of $8,000 per lead by NCH.

- Additional SP Leads to be provided to NCH:
  - Sellers Online Leads
  - Crypto Training Leads

The foregoing definitions and leads are intended to be broadly interpreted by and between the parties to the benefit of both.  It is SP's intention to provide any and all leads generated through their business practices to NCH.

**ARTICLE X.**     Confidentiality and Non-Disclosure.   Each party understands that the other party has disclosed or may disclose information of a confidential nature including, without limitation, know-how, formulas, processes, ideas, inventions, schematics and other technical, business, financial and product development plans, forecasts, strategies and information ("Confidential Information").  Notwithstanding the foregoing, information that is disclosed in a manner in which the Disclosing Party reasonably communicated, or the Receiving Party should reasonably have understood under the circumstances, that the disclosure should be treated as confidential, whether or not the specific designation "confidential" or any similar designation is used, shall be Confidential Information for purposes of this Section.

SP agrees that during and after the term of this Agreement, it shall not disclose the Confidential Information of NCH to any third party, except to the extent necessary for SP to comply with this Agreement.  SP agrees that if it discloses to any outside firm or party, NCH can withhold and discontinue compensation plan as outlined.  NCH does agree that during and after the term of this Agreement, it shall not disclose the Confidential Information of SP to NCH's directors, officers, employees, agents or representatives or to any third party, except to the extent necessary for NCH to comply with this Agreement.

**ARTICLE XI.**     Cooperation/Expectations.   The parties hereto agree to cooperate and to work as a team to effectuate the terms and conditions of the agreement and agree to implement and establish the following:

> a) Cultivate a close working relationship between SP and NCH to ensure 100% Client and Member satisfaction with a goal of "Zero Return Rate Focus" in a mutually agreed upon manner.
> b) Establish clear channels of communication to support product and service sales of both parties.  This will ensure a congruent message through the life of the membership, which will instill confidence and keep the member engaged.
> c) Implement "QUICK RESPONSE" system between SP and NCH to address Member issues, immediately, which translates into a great member experience.
> d) Ongoing training by and between, both NCH and SP, to ensure congruency which will keep the member on track.

**ARTICLE XII.**     Entity Net Orders to SP Terms.   SP desires to sell Nevada entities at their workshops.  SP agrees to exclusively sell Nevada entities, utilizing only the services of NCH. The sales of Nevada entities by SP shall be done pursuant to the following terms and conditions:

- Price per Package is $600
- Package Includes: Nevada LLC and Nevada Reseller Permit; 24 hour entity registration; EIN/Tax ID Acquired for Member; Record Book with Operating Agreement, Ownership Certificates and Seal; 1 year of Entity Support; Registered

Agent Service; 1-hour entity orientation and record book walkthrough.
- SP agrees to pay NCH monthly, on or before the 15th of the following month.

**ARTICLE XIII.**     Recitals.   The recitals above are true and accurate and reflect the agreement and bargain entered into by the Parties to this Agreement and is hereby incorporated herein.

**ARTICLE XIV.**     Notices.   Any and all notices and demands by either party hereto to the other party, required, allowed or desired to be given hereunder, shall be in writing and shall be validly given only if deposited in the United States mail, certified or registered, postage prepaid, return receipt requested, or if made by Federal Express or other delivery service which keeps records of deliveries and attempted deliveries, or if made by facsimile machine with electronic confirmation of receipt (receipt of which is acknowledged or if a copy thereof is promptly delivered by a delivery service which keeps records of deliveries and attempted deliveries). Service shall be conclusively deemed made on the first business day delivery is attempted or upon receipt, whichever is sooner, if addressed as follows:

> To:          Sellers Playbook, Inc.
>              9001 Science Center Drive
>              Minneapolis, Minnesota 55428
>
> To:          Nevada Corporate Headquarters, Inc.
>              4730 S. Fort Apache Rd., Ste. 300
>              Las Vegas, Nevada 89147

**ARTICLE XV.**     Representations and Warranties of the Parties.   The Parties hereby warrant and represent that, on and as of the date of this Agreement, this Agreement constitutes legal and binding obligations on the Parties, and is enforceable against each of the Parties in accordance with its respective terms. The Parties further warrant and represent that they have, and will have at all times referred to herein, full, lawful power and authority to enter into and to carry out the terms of this Agreement and any other correlating transaction and/or documents.

**ARTICLE XVI.**     Governing Law.   This Agreement, and the respective rights and obligations of the Parties hereunder, shall be construed under and be governed by the laws of the State of Nevada without regard to principles of conflict of laws. Any action, claim or proceeding brought under any provision of this Agreement shall be commenced exclusively in the Eighth Judicial District Court of Nevada or the federal courts located in the same location thereof, as Clark County is considered the place of execution of this Agreement. The Parties hereto irrevocably consent to the exclusive jurisdiction and venue of such courts in any such action, claim or proceeding.

**ARTICLE XVII.**     Mediation and Arbitration.   Any controversy amongst the Parties to this Agreement involving the construction or application of any of the terms, provisions, or conditions of this Agreement, shall be submitted first to mediation and then if still unresolved to binding arbitration. Said mediation or binding arbitration shall comply with and be governed by the provisions of the Eighth Judicial District Court, Clark County, Nevada unless the Parties

stipulate otherwise.  The attorneys' fees and costs of arbitration shall be borne by the losing Party, unless the Parties stipulate otherwise, or in such proportions, as the arbitrator shall decide.

**ARTICLE XVIII.**   Entire Agreement.   This Agreement supersedes any and all other agreements, either oral or in writing, between the Parties hereto with respect to the subject matter hereof, and not other agreement, statement, or promise relating to the subject matter of this Agreement which is not contained herein shall be valid or binding.  Each Party does acknowledge that no representations, inducements, promises or agreements, oral or written, have been made by any Party, or anyone acting on behalf of any Party, which is not embodied in this Agreement. This Agreement shall not be amended except in writing signed by all of the Parties hereto.

**ARTICLE XIX.**   Assignment.   This Agreement is not assignable by either Party hereto absent consent and permission from both parties hereto.

**ARTICLE XX.**   Waiver.  No consent or waiver, express or implied, to or of any breach or default in the performance of any covenant or representation or warranty contained in this Agreement shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other covenant or representation or warranty hereunder. The failure of NCH to enforce at any time any of the provisions of this Agreement or to require at any time performance by SP of any of the provisions hereof, shall not be construed as a waiver of such provisions, nor in any way affect the validity of this Agreement or any part thereof, or the right of NCH thereafter to enforce every provision of this Agreement.

**ARTICLE XXI.**   Interpretation.  The headings of the paragraphs of this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provisions thereof.  Unless the context otherwise requires (a) the use of the singular form includes the plural, and the use of the plural form includes the singular. (b)  the words "herein", "hereof", and "hereunder" refer to this Agreement as a whole and not to any particular provision. (c) the words "include" and "including" mean without limitation by reason of enumeration. and (d) a reference to a paragraph of this Agreement shall include all subparagraphs of that paragraph.  This Agreement shall be construed fairly as to the Parties and not in favor of or against any Party, regardless of which party prepared this Agreement.

**ARTICLE XXII.**   Attorney's Fees.  If any action or proceeding is brought to enforce or interpret any provision of this Agreement, the prevailing Party in such action or proceeding shall be entitled to reasonable attorney's fees, including costs allocable to in-house attorneys, in addition to any other relief to which such prevailing Party may be entitled.

**ARTICLE XXIII.**   Severability.  If, for any reason, any provision of this Agreement is held invalid, all other provisions of this agreement shall remain in effect.

**ARTICLE XXIV.**   Binding Effect.  The terms, covenants, conditions and agreements herein contained shall inure to the benefit of and be binding upon the parties and their respective heirs, successors, assigns and legal representatives.

---

EXCLUSIVE LEAD GENERATION AND ADMINISTRATION AGREEMENT

NCH0007

**ARTICLE XXV.**    Counterparts.  This Agreement may be executed in counterparts and all so executed documents shall constitute one Agreement, binding upon all the parties, notwithstanding that all the parties are not signatories to the original or the same counterpart. Any Counterparts are to be signed as such by recognition of this Agreement and/or reference hereto.

**ARTICLE XXVI.**    Power to Bind.  Neither party shall have any power or authority to accept any order or to enter into any contract, undertaking or agreement for or on behalf of the or to assume or create any obligation or responsibility expressed or implied in behalf of or in the name of the other party or to bind the other in any manner whatsoever.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed in their respective names, in person or by their authorized officers, as of the date indicated below and this Agreement shall be deemed effective for tax purposes on _April 24_____, 2018.


NEVADA CORPORATE HEADQUARTERS                April 24, 2018
INC., by an authorized Representative


SELLERS PLAYBOOK, INC. by an                April 24, 2018
Authorized Representative

NCH0008

# Exhibit 2

NCH0009

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

FEDERAL TRADE COMMISSION, and

STATE OF MINNESOTA, by its Attorney
General, Lori Swanson,

    Plaintiffs,

    v.

SELLERS PLAYBOOK, INC., a
corporation,

EXPOSURE MARKETING COMPANY,
a corporation, also d/b/a Sellers Online and
Sellers Systems,

JESSIE CONNERS TIEVA, individually
and as an officer of SELLERS
PLAYBOOK, INC. and EXPOSURE
MARKETING COMPANY, and

MATTHEW R. TIEVA, individually and
as an officer of SELLERS PLAYBOOK,
INC. and EXPOSURE MARKETING
COMPANY,

    Defendants.

CASE NO. 18 sc 2207 DWF/TNL

## FILED UNDER SEAL

## COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF



Plaintiffs, the Federal Trade Commission ("FTC"), and the State of

Minnesota, by its Attorney General Lori Swanson ("State of Minnesota"), for their

Complaint allege:

    1.    The FTC brings this action under Sections 13(b) and 19 of the Federal



Opportunity Rule, 16 C.F.R. Part 437, and the Consumer Review Fairness Act of

2016 ("CRFA"), 15 U.S.C. § 45b, to obtain temporary, preliminary, and permanent

injunctive relief, rescission or reformation of contracts, restitution, the refund of

monies paid, disgorgement of ill-gotten monies, and other equitable relief for

Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C.

§ 45(a), the Business Opportunity Rule, 16 C.F.R. Part 437, and the CRFA, 15

U.S.C. § 45b, in connection with Defendants' marketing of business opportunities.

2.     The State of Minnesota, by its Attorney General, brings this

enforcement action to, among other things, obtain temporary, preliminary, and

permanent injunctive relief, restitution, and civil penalties for Defendants' acts or

practices in violation of the Minnesota Uniform Deceptive Trade Practices Act,

Minn. Stat. §§ 325D.43-.48, the Minnesota Prevention of Consumer Fraud Act,

Minn. Stat. §§ 325F.68-.694, and the CRFA, 15 U.S.C. § 45b in connection with

Defendants' marketing of business opportunities.

## SUMMARY OF THE CASE

3.     Defendants lure consumers into purchasing expensive business

opportunities by deceptively offering consumers a "full-service, turnkey package"

for getting their "piece of the $400 Billion Amazon Pie." They represent that

purchasers are likely to earn thousands of dollars a month by implementing

NCH 0011

Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, the Business

NCH0012

Defendants' "customized system to perfect the individual's ability to sell on Amazon effectively and profitably." Defendants' earnings claims are false and unsubstantiated. Contrary to Defendants' representations, purchasers of Defendants' business opportunities are unlikely to earn the advertised income.

4.      In perpetrating their scheme, Defendants have violated the FTC Act, the Business Opportunity Rule, the CFRA, the Minnesota Uniform Deceptive Trade Practices Act, and the Minnesota Prevention of Consumer Fraud Act by, among other things: (1) making false or unsubstantiated earnings claims; (2) failing to furnish prospective purchasers with required disclosure documents; and (3) using form contract provisions that restrict individual consumers' ability to review defendants' products, services, or conduct.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a) and 53(b).

6.      This Court has supplemental jurisdiction over the State of Minnesota's claims pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this district under 28 U.S.C. § 1391 (b)(1), (b)(2), (c)(1), and (c)(2), and 15 U.S.C. §§ 53(b), 56(a)(2)(B), and 57b.

NCH0013

## PLAINTIFFS

8.     The FTC is an independent agency of the United States Government
created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC
Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or
affecting commerce. The FTC also enforces the Business Opportunity Rule, 16
C.F.R. Part 437. The Business Opportunity Rule addresses common deceptive or
unfair practices engaged in by fraudulent business opportunity sellers, such as
inducing consumers to pay significant sums of money by means of false or
unsubstantiated earnings claims. Additionally, the FTC enforces the CRFA, 15
U.S.C. § 45b. The CRFA prohibits the offering of provisions in form contracts
that restrict individual consumers' ability to communicate reviews, performance
assessments, and similar analyses about a seller's products, services, or conduct.

9.     The FTC is authorized to initiate federal district court proceedings, by
its own attorneys, to enjoin violations of the FTC Act, Business Opportunity Rule,
and CRFA and to secure such equitable relief as may be appropriate in each case,
including rescission or reformation of contracts, restitution, the refund of monies
paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 45b(d)(2)(A), 53(b),
56(a)(2)(A), 56(a)(2)(B), and 57b, and the Business Opportunity Rule, 16 C.F.R.
Part 437.

NCH0014

10.    Lori Swanson, Attorney General of the State of Minnesota, is
authorized under Minnesota Statutes chapter 8; the Minnesota Uniform Deceptive
Trade Practices Act, Minn. Stat. §§ 325D.43-.48; the Minnesota Prevention of
Consumer Fraud Act, Minn. Stat. §§ 325F.68-.694; the CRFA, 15 U.S.C. §
45b(e)(1); and has common law authority, including *parens patriae* authority, to
bring this action on behalf of the State of Minnesota and its citizens to enforce
Minnesota law and the CRFA.

## DEFENDANTS

11.    Defendant Sellers Playbook, Inc. ("Sellers Playbook") is a Minnesota
corporation with its principal place of business at 9001 Science Center Drive, New
Hope, Minnesota 55428.  Sellers Playbook transacts or has transacted business in
this district and throughout the United States.  At times material to this Complaint,
acting alone or in concert with others, Sellers Playbook has advertised, marketed,
distributed, or sold business opportunities to consumers throughout the United
States.

12.    Defendant Exposure Marketing Company ("Exposure Marketing"),
also doing business as "Sellers Online" and "Sellers Systems," is a Minnesota
corporation with its principal place of business at 9001 Science Center Drive, New
Hope, Minnesota 55428.  Exposure Marketing transacts or has transacted business
in this district and throughout the United States.  At times material to this

NCH0015

Complaint, acting alone or in concert with others, Exposure Marketing has advertised, marketed, distributed, or sold business opportunities to consumers throughout the United States.

13.    Defendant Jessie Conners Tieva ("Jessie Tieva") is the secretary and founder of Sellers Playbook, and the president of Exposure Marketing.  At all times material to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant Jessie Tieva, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

14.    Defendant Matthew R. Tieva ("Matt Tieva") is the president and chief executive officer of Sellers Playbook, and the vice president and chief executive officer of Exposure Marketing.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant Matt Tieva, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

15.    Defendants Sellers Playbook and Exposure Marketing (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in

6

NCH0016

the deceptive acts and practices and other violations of law alleged below.

Defendants have conducted the business practices described below through an

interrelated network of companies that have unified advertising and marketing

practices, common ownership, officers, managers, business functions, employees,

warehouse locations, and office locations.  Because the Corporate Defendants have

operated as a common enterprise, each of them is jointly and severally liable for

the acts and practices alleged below.  Defendants Jessie Tieva and Matt Tieva have

formulated, directed, controlled, had the authority to control, or participated in the

acts and practices of the Corporate Defendants that constitute the common

enterprise.

## COMMERCE

16.    At all times material to this Complaint, Defendants have maintained a

substantial course of trade in or affecting commerce, as "commerce" is defined in

Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

17.    Since at least 2016, Defendants Jessie Tieva, Matt Tieva, and

Exposure Marketing have deceptively advertised, marketed, distributed, promoted,

and sold business opportunities to consumers throughout the United States.

18.    In October 2016, Defendant Jessie Tieva, personally and through her

company Defendant Exposure Marketing, promoted and sold a business

7

NCH0017

opportunity, known as "FBA Stores," that purported to provide prospective purchasers with a system for earning thousands of dollars a month as third-party sellers on Amazon.com.

19.     Defendant Matt Tieva, Jessie Tieva's husband, was an officer and co-owner of Exposure Marketing during the relevant time and shared in the profits generated through the sale and promotion of FBA Stores.

20.     In early 2017, Jessie Tieva and Matt Tieva formed Defendant Sellers Playbook and began deceptively advertising, marketing, distributing, promoting, and selling the "Sellers Playbook" business opportunity, which is a copycat of FBA Stores.

21.     Defendants make earnings claims in connection with the offer for sale, sale, and promotion of these business opportunities.

22.     For example, in their advertising and marketing of Sellers Playbook, Defendants represent that consumers who purchase and deploy that business opportunity are likely to profit by selling products on Amazon.com and through other channels online.

23.     Typical earnings claims made in Defendants' advertising and marketing include the following:

    A.     "There are 100,000 Amazon Sellers with sales of $100,000 or
           more in 2016."

8

NCH0018

B.   "[W]e're going to talk about some strategies this afternoon that's [sic] going to show you how to make 15 to 30 percent. Tomorrow, I'm going to go through more wholesaling, and I'm going to teach you guys how to start making anywhere from 20 to 35, 40 percent. On Sunday, we're going to talk about private labeling. Private label, we start making anywhere from 40 to 60 percent. And I've seen a lot of our people making over 70 percent. Now, is 70 percent a good rate of return?"

C.   "Holy cow, guys. That's when you start seeing the returns of what we want you to have, $20,000 a month."

D.   "Potential Net Profit: $1,287,463.38."

E.   "Starting with $1000…1 year later over $210,000."

24.   Defendants' earnings claims regarding the business opportunities are false or unsubstantiated.

25.   Few, if any, consumers who purchase Defendants' business opportunities earn the income Defendants advertise.

26.   Defendants also disseminate industry financial, earnings, or performance information in connection with the offer for sale, sale, and promotion of the business opportunities while lacking written substantiation demonstrating that the information reflects, or does not exceed, the typical or ordinary financial

9

NCH0019

earnings, or performance experience of purchasers of the business opportunities.

27.     For example, on May 4, 2018, Don Montgomery, one of Defendants'
presenters, made the following oral representations during a live event promoting
Sellers Playbook at the Sheraton Lake Buena Vista Resort in Orlando, Florida:

A.     "Amazon is the largest marketplace in the world.  They have
actually more buyers and more customers coming to their store
than anywhere else.  They have a larger market cap than
Walmart and all those other major retailers combined, and
they're worth more than Walmart and all those other major
retailers combined.  And their lead continues to grow."

B.     "[L]ast year, Amazon reported $177 billion net profit.  Now,
here's what should be exciting for you, is that that money right
there is third-party seller money, my money, potentially your
money.  So of that $177 billion, how much of that would you
like to have for you and your family?"

28.     Further, on their website promoting Sellers Playbook,
thesellersplaybook.com, Defendants present consumers with the following industry
performance information:

10

NCH0020



## Why **You Need** To Be On **Amazon:**

- ✔ There are 100,000 Amazon Sellers with sales of $100,000 or more in 2016.

- ✔ 44% of web shoppers go directly to Amazon for product searches. Many of the other 56% end up there too thanks to Amazon's Google ads and search engine listings.

- ✔ Amazon is consistently ranked as the most trusted brand in America. As a marketplace seller, you share in this trust.

- ✔ Amazon has over 304 million active customer accounts with credit cards saved.

- ✔ Amazon owns as much of the retail market in North America as Office Depot, Staples, Apple, Dell, WalMart, and Sears combined.

29.    Defendants also present consumers with industry performance information during their webinars marketing Sellers Playbook. A screenshot of industry performance information displayed during a Sellers Playbook webinar appears below.

30.    The industry information used by the Defendants to promote Sellers

11

Playbook leaves consumers with the impression that they are likely to earn significant income if they purchase and implement the Sellers Playbook system. This industry performance exceeds, or does not reflect, the performance experience of typical purchasers of the Sellers Playbook.

31.     Defendants formulated, planned, directed, and controlled their deceptive advertising, marketing, distributing, promoting, and selling of the "FBA Stores" and/or "Sellers Playbook" goods and services to consumers from their principal place of business in New Hope, Minnesota.  In addition, numerous circumstances relating to Defendants' deceptive advertising, marketing, distributing, promoting, and selling of the "FBA Stores" and/or "Sellers Playbook" goods and services occur substantially within Minnesota, including but not limited to depositing funds received from their deceptive practices into Minnesota bank accounts, charging consumers for deceptive goods and services from Minnesota merchant accounts, specifying in their contracts with consumers that their transactions are governed by Minnesota law, and formulating, planning, directing, and controlling the deceptive practices from Defendants' principal place of business within Minnesota.

### Amazon's Third-Party Seller Program

32.     Amazon.com is a popular website owned and operated by Amazon.com, Inc. ("Amazon").  Millions of consumers use Amazon.com every

NCH0022

day to purchase a wide range of products, across dozens of product categories, from Amazon and its authorized third-party sellers.

33.     Amazon's third-party seller program provides registered sellers access to Amazon's customer-base, Internet outlets, and other benefits.

34.     To sell products on Amazon.com, third-party sellers must create a "Selling on Amazon" account ("Amazon Selling Account") using Amazon's Seller Central, the Web interface where third-party sellers open and manage their Internet outlet or "Amazon Store."

35.     When they open their Amazon Selling Account, third-party sellers must agree to the Amazon Services Business Solutions Agreement ("Amazon BSA"); which governs access to and use of Amazon's services and sets forth Amazon's rules and restrictions for selling on Amazon.com.

36.     After opening an Amazon Selling Account, selling on Amazon.com involves three main steps: (1) listing products; (2) selling the products; and (3) shipping the products to consumers.

37.     The first step in selling a product on Amazon.com requires the third-party seller to create a listing accurately identifying the product for sale. Each product sold is assigned a unique Amazon Standard Identification Number ("ASIN").

NCH0023

38.    After a product is listed, it becomes available for purchase on Amazon.com.

39.    Products listed for sale on Amazon.com appear on a product detail page, which customers typically reach after searching for a product or category of products.

40.    Multiple sellers can offer the same product on Amazon.com and compete for prominent placement on the product detail page based on price and certain performance-based requirements and metrics (e.g., order defect rate, chargeback rate, speed of delivery, and experience with the Amazon selling service).

41.    Once a customer places an order on Amazon.com, Amazon notifies the third-party seller.  Orders are then fulfilled in one of two ways:  (1) by the third-party seller itself; or (2) by Amazon, if the third-party seller is using Amazon's "Fulfillment by Amazon" ("FBA") service.

42.    Amazon offers third-party sellers the option of fulfilling orders through its FBA service.  With the FBA service, third-party sellers can ship their products to one of the Amazon fulfillment centers located around the country and Amazon will pick, pack, and ship these products to the end customer.  Products offered through Amazon's FBA service are displayed on Amazon.com with Amazon's Prime logo, indicating to customers that Amazon itself handles the

NCH0024

shipping and customer service. Products shipped from Amazon's fulfillment centers are also eligible for Amazon Prime free two-day shipping for Prime members and free shipping for all customers. Amazon also provides customer service for these products, handling questions, complaints, returns, and refunds.

### Defendants' Marketing of the FBA Stores Business Opportunity

43.     From at least 2014 until March 14, 2018, FBA Stores, LLC, its affiliates, and principals (collectively "FBA Stores LLC") operated a business opportunity scheme that purported to provide prospective purchasers with a "plug-and-play system" for earning thousands of dollars a month as a third-party seller on Amazon.com. Adam Bowser and Chris Bowser were the co-founders and owners of FBA Stores, LLC.

44.     FBA Stores LLC ceased operations in March 2018 as a result of a Federal Trade Commission enforcement action.

45.     FBA Stores LLC was not affiliated with, or connected to, Amazon in any way.

46.     Defendant Jessie Tieva participated in and promoted, through Exposure Marketing, FBA Stores LLC's business opportunities from October 2016 to February 2017.

47.     In perpetrating its scheme, FBA Stores LLC lured consumers with false earnings claims such as: "My name is Adam Bowser, and over the past 18

15

NCH0025

years I have sold over $50 million online.  I'm going to be hosting a few local workshops around the Seattle area to share my secrets for making money on Amazon."

48.     In marketing its business opportunities, FBA Stores LLC's initial step was to bring consumers in for a free two-hour seminar.  At the seminar, they pitched their $995 three-day workshops with claims such as "How many of you would love to be able to make an extra $5,000 to $10,000 a month by spending 30 minutes to an hour a day learning and implementing a plug-and-play system I'm going to share with you here in a moment."

49.     During its three-day workshops, FBA Stores LLC shifted to selling more expensive packages like the $34,995 "Diamond" enrollment which included, among other things, "16 Personal 1 on 1 Coaching Sessions."  False earnings claims permeated FBA Stores's three-day workshops.

50.     On August 11, 2016, Jessie Tieva spoke with Adam Bowser about joining the FBA Stores LLC sales team.

51.     Soon thereafter, Jessie Tieva agreed to join FBA Stores LLC as a speaker for its live three-day workshops and her first FBA Stores LLC speaking event was scheduled for October 14, 2016.

52.     From October 2016 to February 2017, Jessie Tieva spoke at FBA Stores LLC live events throughout the United States and Canada including in

16

NCH0026

Austin, Chicago, Dallas, Denver, Fort Lauderdale, Hollywood, Long Beach, New York, Norfolk, Phoenix, Seattle, and Toronto.

53.    Jessie Tieva routinely made false and unsubstantiated earnings claims during her sales presentations at FBA Stores' live events.  For example, during an FBA Stores live event she conducted in Long Beach, California, Jessie Tieva made numerous earnings claims, including the following claim: "so product availability, we [FBA Stores] have access to product with profit margins of 20 percent, 30 percent, higher, the nice thing with the product is it already is all researched for us…."

54.    Jessie Tieva identified Exposure Marketing Company as the entity that should receive the commissions she expected to generate as an FBA Stores live event speaker in an Internal Revenue Service Form W-9 she sent to FBA Stores on September 28, 2016.

55.    Exposure Marketing Company received a commission of approximately 10 percent of the sales generated by Jessie Tieva as a speaker at the FBA Stores live events.

56.    From October 2016 to February 2017, Jessie Tieva and her team were responsible for generating in excess of $3.4 million of sales for FBA Stores.

57.    From October 2016 to March 2017, FBA Stores paid Exposure Marketing Company commissions of approximately $349,047.94 in connection

NCH0027

with FBA Stores sales generated by Jessie Tieva and her team.  Exposure Marketing deposited the funds it received from FBA Stores LLC into its Minnesota bank accounts.

58.     Sometime in February or March 2017, Jessie Tieva and Exposure Marketing Company severed their business relationship with FBA Stores.

59.     On March 12, 2018, the FTC filed a Complaint for Permanent Injunction and Other Equitable Relief against FBA Stores alleging multiple violations of the FTC Act and the Business Opportunity Rule in connection with FBA Stores's deceptive marketing of its business opportunities.  *See* Complaint, *FTC v. AWS, LLC et al.*, Case No. 2:18-cv-00442-JCM-PAL (D. Nev. filed Mar. 12, 2018) (ECF No. 1).  The FTC also moved for an *ex parte* temporary restraining order and preliminary injunction against FBA Stores.

60.     On March 14, 2018, the United States District Court for the District of Nevada entered a temporary restraining order enjoining FBA Stores's deceptive marketing practices, freezing its assets, and appointing a temporary receiver.  *See* Temporary Restraining Order, *FTC v. AWS, LLC et al.*, Case No. 2:18-cv-00442-JCM-PAL (D. Nev. filed Mar. 12, 2018) (ECF No. 29).

61.     On June 15, 2018, the United States District Court for the District of Nevada entered a Stipulated Order for Permanent Injunction and Monetary Judgment as to FBA Stores.  *See* Stipulated Order for Permanent Injunction and

NCH0028

Monetary Judgment, *FTC v. AWS, LLC et al.*, Case No. 2:18-cv-00442-JCM-PAL (D. Nev. filed Mar. 12, 2018) (ECF No. 80).

### Defendants' Sellers Playbook System

62.    On February 3, 2017, Jessie and Matt Tieva formed Sellers Playbook in the State of Minnesota where it is headquartered.

63.    They formed Sellers Playbook Inc. at approximately the same time or slightly before Jessie Tieva and Exposure Marketing cut ties with FBA Stores.

64.    Shortly after forming Sellers Playbook, Inc., and in direct competition with FBA Stores, Defendants began to market, promote, and sell business opportunities substantially similar to the business opportunities offered by FBA Stores.

65.    Despite the Federal Trade Commission's March 2018 enforcement action against FBA Stores, Defendants continue marketing their business opportunities using deceptive earnings claims very similar to those used by FBA Stores.

66.    Defendants are not affiliated with, or connected to, Amazon in any way.

67.    Since 2017, Defendants have marketed their business opportunities under multiple brand names including Sellers Playbook, Sellers Online, and Sellers Systems (collectively the "Sellers Playbook System").

NCH0029

68.     Defendants offer the Sellers Playbook System to consumers through a variety of marketing mediums including email, websites, online videos, webinars, electronic books, social media such as Facebook and Instagram, and live events.

69.     Defendants widely disseminate their marketing and advertising for the Sellers Playbook System throughout the United States.

70.     Defendants' marketing and advertising indicates that Sellers Playbook is located in Minneapolis, Minnesota.

71.     Defendants solicit prospective purchasers to enter into a new business using the Sellers Playbook System to sell products as third-party sellers on Amazon.com.

72.     Defendants describe the Sellers Playbook System as a "comprehensive program" to assist purchasers in launching and growing a new online business selling products as a third-party seller on Amazon.com.

73.     Defendants require prospective purchasers to make a payment to purchase the Sellers Playbook System.

74.     Defendants represent that they or one or more designated persons, including Amazon, will provide prospective purchasers of the Sellers Playbook System the following:

          A.     An Internet outlet in the form of one or more Amazon stores or accounts where prospective purchasers will be able to sell products as

20

NCH0030

third-party sellers on Amazon.com;

B.     Assistance to get up and running on Amazon.com;

C.     Storage, handling, packing, labeling, shipping, and inventorying

of products to sell on Amazon.com;

D.     "Supplier Lists and Sourcing Solutions;"

E.     Access to "trade shows to spread your brand;" and

F.     "[O]riginal software that has been revolutionizing the way

entrepreneurs compete in online retail."

75.    The price of the Sellers Playbook System ranges from $497 to more

than $30,000 depending on what level of "enrollment" or "package" prospective

purchasers choose and what "bonuses" they select.

76.    For example, the base $497 Sellers Playbook System package

provides Defendants' purported "intensive learning experience about Amazon"

through a three-day live workshop, and access to the "Sellers Playbook Basic

Membership Site."  The higher level $32,997 Sellers Playbook "Business Pro

Membership" offers prospective purchasers "32 scheduled coaching/strategy

sessions" and other purported "bonuses" such as a "Private Label Concierge

Service" in addition to the workshop and membership site offered with the base

Sellers Playbook System package.

77.    During the personal coaching/strategy sessions, Defendants typically

NCH0031

convey substantially similar strategies and content as Defendants' three-day live workshops and membership site.

### Defendants' Marketing Campaigns
### to Recruit Consumers to Attend Live Events

78.     In an effort to lure consumers into purchasing the Sellers Playbook System, Defendants conduct free two-hour live "seminars" or "workshops."

79.     Defendants have conducted Sellers Playbook live events throughout the United States including in Albuquerque, Anaheim, Anchorage, Atlanta, Atlantic City, Austin,  Baltimore, Boise, Boston, Buffalo, Charleston, Charlotte, Chicago, Cincinnati, Cleveland, Columbus, Dallas, Denver, Des Moines, Detroit, El Paso, Fort Lauderdale, Fort Myers, Fort Wayne, Fort Worth, Grand Rapids, Hartford, Honolulu, Houston, Indianapolis, Jacksonville, Kansas City, Las Vegas, Lincoln, Long Beach, Long Island, Los Angeles, Louisville, Memphis, Miami, Milwaukee, Nashville, New York City, Newark, Norfolk, Oklahoma City, Orlando, Palm Springs, Philadelphia, Phoenix, Pittsburgh, Raleigh, Reno, Richmond, Sacramento, Salt Lake City, San Antonio, San Diego, San Francisco, San Jose, Seattle, Saint Louis, Tampa, Tucson, Washington DC, and Wichita.

80.     Defendants promote their live events by targeting consumers that live near an upcoming live event.

81.     Defendants promote their live events using email and social media such as Facebook and Instagram.

NCH0032

82.    In August 2017, Defendants disseminated promotional materials, including Facebook advertisements, to consumers in Colorado for a live event in Denver. A true and correct copy of a Sellers Playbook advertisement shown on Facebook to consumers in the Denver, Colorado area appears below.



FB COM
**Free "How To Start Your Amazon Store" Workshop in Denver**
Free workshop, limited seats...register now.

83.    Defendants' social media advertisements typically urge consumers to "register now" to attend a "FREE Amazon Event" in their local area.

84.    Consumers who click on Defendants' social media advertisements are automatically directed to the Sellers Playbook website where they can select the time, date and location of an "upcoming FREE 2-hour Seminar" in the targeted area.

85.    Defendants typically offer the free two-hour workshops over 4-5 days at multiple hotels in the targeted area.

NCH0033

86.     On the Sellers Playbook website, Defendants claim that the "Free LIVE 2-Hour Workshop Reveals... How To Start Your Own **Online Amazon Store**...Even Starting With **No Product, No Inventory, No Tech Know-How** And **Without Having To Ship Anything** Yourself..."

### Defendants' Free Two-Hour Workshops

87.     During the free two-hour workshops, Defendants attempt to convince consumers to purchase the Sellers Playbook System and enroll in their three day "Sellers Playbook Training Workshop," which they typically offer at a "discount" of $497.

88.     Defendants make earnings claims throughout their free two-hour workshops and share examples and testimonials of purportedly successful purchasers of the Sellers Playbook System.

89.     For example, on May 4, 2018, Don Montgomery, one of Defendants' presenters, made the following oral representations during a free two-hour workshop promoting the Sellers Playbook System held at the Sheraton Lake Buena Vista Resort in Orlando, Florida:

> A.     "I know you're all (inaudible) here to learn how to make more money.  So whether you're out here to learn how to make four figures, five figures or more on a monthly basis selling on Amazon, that's very well possible."

NCH0034

B.   "I'm going to be showing you how that [sic] you can actually
have time freedom and at the same time make a substantial
income selling on Amazon."

C.   "Now, think about this.  How much money do you actually
have to have to start this business so that you can actually start
making money and be successful?  The answer is is [sic] not
much.  We've literally had students that started with just as
little as $200.  That's all they had.  They only had 200 bucks,
and they have literally compounded their profits over time in
their Amazon business to today they have a very successful,
wealthy Amazon business.  Now, we've had some students start
with more and they started with 1,000 bucks or $2,000 or more.
And at the same time, how would you guys like me to show
you how to do this?  How would you like me to show you how
you can actually start off using someone else's money so that
you can actually leverage beyond what you currently have, so
you can get into quicker profits and bigger profits faster?
Would you like me to show you how to do that?"

D.   "538 million products, because that's what you can do, right, as
of right now.  That's unlimited.  That's what we're talking

25

NCH0035

about. You see, this is rinse and repeat is [sic] the way our system is developed. You establish one product and you get it performing and making $1,000, $2,000, $3,000 or more on a monthly basis, and then you add another one, and you get that one going, the exact same thing. And then you add another one. You guys understand that to make the process? That's how easy we've developed it and made it simple. And that's why I'm so excited about it. Now, think about this. If you're actually able to hold on the hand of someone that actually is making a lot of money and you were able to follow their step-by-step process on how they (inaudible) make money on Amazon, would that make it easier and would that eliminate all your procrastination of getting started?"

E. "Okay, so let's do this. I took a screenshot of one of our trainers right off of his Amazon account. This is what he makes net on a -- and on a weekly -- or biweekly basis. You'll be able to see that. And that (inaudible) this is your account starting out so you can start to understand what it feels like to make money selling on Amazon. For those of you in back, I'm going to go ahead and read these numbers out, so they're small, and

26

NCH0036

that way you guys can all see them. All right, so here we go.
Your first week in your Amazon business, you just received a
wire for $17,000. How you feeling?...Pretty good? All right.
Two weeks later, you get another wire from Amazon for
$16,000. Now, let's check your discipline. Over the last two
weeks, you just made $33,000 in your Amazon business
following this system. What do you do with that money?"

90.    During the same free two-hour Sellers Playbook workshop, Don
Montgomery displayed multiple slides containing earnings claims. A true and
correct copy of one of the slides displayed by Don Montgomery appears below.

NCH0037

91.     Defendants also tell consumers who attend the free two-hour workshops that it's not possible to teach them everything in two hours and that to fully understand Defendants' system and receive the necessary software products and access to a network of wholesalers, consumers need to purchase the Sellers Playbook System and attend Defendants' three-day "Sellers Playbook Training Workshop" ("3-Day Workshop").

92.     Defendants typically offer the Sellers Playbook System base package, which includes enrollment in a 3-Day Workshop, for $497 to $997.

93.     The base Sellers Playbook System package typically includes, among other things, a "free gift" for attending the 3-Day Workshop, such as a Kindle and online access to the "Sellers Playbook Basic Membership Site."

94.     Defendants typically require consumers purchasing the Sellers Playbook System base package to sign a form contract.  Attached as **Exhibit A** is a true and correct copy of a Sellers Playbook form contract signed on May 4, 2018 and enrolling a consumer in a 3-Day Workshop.

95.     Defendants' form contracts, including their form contracts for the Sellers Playbook System base package, typically include a Mutual Non-Disparagement Covenant that bars or restricts the ability of the consumer purchasing the Sellers Playbook System from engaging in reviews, performance assessments, and similar analyses of Defendants' goods, services, or conduct.

NCH0038

96.     For example, the Sellers Playbook form contract attached as Exhibit A
to this Complaint contains a Mutual Non-Disparagement Covenant which provides
as follows:

> Client hereby agree that it will not, at any time, directly or indirectly,
> make any oral or written public statements that are disparaging of
> [Sellers Playbook], [Sellers Playbook]'s products or services, or any
> of [Sellers Playbook]'s present or former owners, employees or
> independent contractors.  [Sellers Playbook] (limited to its officers
> and directors) agrees that it will not, at any time, directly or indirectly,
> make any oral or written public statements that are disparaging of
> Client.  Disparagement shall be defined as any oral or written public
> statements that impugn the qualities, character, honesty, integrity,
> morality, business acumen, or abilities of the subject provided,
> however, that nothing in this paragraph is intended to prevent buyer
> from publishing or submitting to any consumer protection agency any
> truthful written, oral, or pictorial review, performance assessment of,
> or other similar analysis of [Sellers Playbook]'s services, including by
> electronic means.

97.     Defendants' form contracts, including their form contracts for the
Sellers Playbook System base package, typically include a "Governing Law"

29

NCH0039

provision specifying that the contract "shall be governed by the laws of the State of Minnesota."

98.     Defendants' form contracts, including their form contracts for the Sellers Playbook System base package, typically include a "Dispute Resolution" provision specifying that any dispute or controversy arising under or in connection with the contract "shall be settled exclusively by binding arbitration solely by written submission in Hennepin County, in the State of Minnesota."

### Defendants' 3-Day Workshops

99.     Defendants hold 3-Day Workshops throughout the United States.

100.    Defendants typically hold their 3-Day Workshops within a month of, and in close proximity to the location of, the free two-hour workshops.

101.    During the 3-Day Workshops, Defendants attempt to convince consumers to upgrade to more expensive enrollment levels of the Sellers Playbook System and buy additional products and services.

102.    Defendants offer "Business Pro," "Elite Pro," and "Jump Start" enrollments for at least $32,997, $26,997, and $6,997 respectively.  A true and correct copy of a "Membership Enrollment" pricing sheet used by Defendants to describe and sell higher level enrollments of the Sellers Playbook System is attached as **Exhibit B**.

NCH0040

103.   Defendants have also offered "Diamond," "Platinum," "Gold," and "Silver" enrollments with retail prices as high as $47,997.

104.   Defendants require consumers enrolling in a higher-level enrollment such as the "Diamond" package to sign a written agreement.  Attached as **Exhibit C** is a true and correct copy of a written agreement for the "Diamond" package.

105.   Defendants' higher-level enrollments for the Sellers Playbook System typically feature "personalized coaching" sessions, "Receiving, Warehousing and FBA Preparation" services, and other "bonuses," such as a "personalized tradeshow tour."  A true and correct copy of a handout Defendants use to describe some of the "bonuses" they offer is attached as **Exhibit D**.

106.   Defendants claim that as part of their "Receiving, Warehousing and FBA Preparation" service, they will receive product shipments ordered from wholesalers, and store, label, and ship those products to Amazon's fulfillment centers exclusively on behalf of purchasers of the Sellers Playbook System.

107.   During the course of the 3-Day Workshops, Defendants repeat, reinforce, and expand on the earnings claims made in the free two-hour workshop. They do so through additional testimonials and specific purported examples designed to give prospective purchasers the impression that they will likely realize high profit margins using the Sellers Playbook System.

NCH0041

108.   For example, on May 18, 2018, Mike Schreiner, one of Defendants' presenters, made the following oral representations during a 3-Day Workshop held at the Doubletree by Hilton Hotel Airport in Orlando, Florida:

A.   "How many of you would like to learn how to turn a $5- to $10,000 investment into a $25- to a $1.2 million return with your investment? Yeah. And you're going to learn those strategies before you leave here today. So, as I said, guys, I'm going to fulfill everything that was promised and then some. And some of you in here want to go to that next level. Some of you want to take this a step further. There's some of you in this room that (inaudible) weekend training. If that's what you want, that's exactly what you're going to get. But the thing you got to find out -- what you're going to find out with Sellers Playbook, too, guys, is we're not a one-year, two-year, three- year (inaudible). We're in this for as long as you want the ride."

B.   "So we just got to look at where we're putting our time, where we're putting our efforts. Because for me, I want to give myself the biggest bang that I can do. So here's the thing, guys. Everything we're going to talk about this weekend, your bare minimum rate of return that we're going to look for if it's

32

NCH0042

acceptable is 15 percent. Period."

C.    "Now, is 15 percent a good rate or return? Yes or no? Guys,

I'm telling you right now, investors haven't seen these type of

returns in years. Fifteen percent is huge. But here's the thing.

Me, I would be (inaudible). Right? So today we're going to talk

about some strategies this afternoon that's going to show you

how to make 15 to 30 percent. Tomorrow, I'm going to go

through more wholesaling, and I'm going to teach you guys

how to start making anywhere from 20 to 35, 40 percent. On

Sunday, we're going to talk about private labeling. Private

label, we start making anywhere from 40 to 60 percent. And

I've seen a lot of our people making over 70 percent. Now, is

70 percent a good rate of return? Yes or no?"

D.    "Holy cow, guys. That's when you start seeing the returns of

what we want you to have, $20,000 a month. In fact, let me ask,

how many of you in here by a show of hands have bought

something off of Amazon before?"

109.   Contrary to Defendants' representations, consumers who purchase the

Sellers Playbook System and attempt to deploy the strategies conveyed during the

33

NCH0043

3-Day Workshops, in Defendants' videos and webinars, and during the personal coaching sessions are unlikely to earn the income that Defendants advertise.

110.   Defendants have no adequate basis for making earnings claims in connection with the marketing, selling, and advertising of the Sellers Playbook System.

111.   On February 22, 2018, the Advertising Review Manager for the Better Business Bureau of Minnesota and North Dakota ("BBB") sent an email to Matt Tieva posing several questions regarding Sellers Playbook's business practices, including: "How many or what percent of clients have achieved success using your program?"  In responding to this question in a February 28, 2018 email to the BBB, Matt Tieva wrote, in relevant part: "Each client owns their own private company and we do not ask them to share their private financial data with us.  We do not have access to the data to answer the question."

### Defendants' Earnings Disclaimers

112.   Many of the websites promoting the Sellers Playbook System, including thesellersplaybook.com, contain an earnings disclaimer in small, inconspicuous, grey font near the bottom of each page which provides as follows:

> Results may vary and are not typical.  Most individuals
>
> who attend Sellers Playbook free workshops don't apply
>
> the strategies, techniques, and systems and therefore

34

NCH0044

make little to no money.  Any income or earnings

depicted should not be interpreted as common, typical,

expected, or normal.  These results may be exceptional

and variables that impact results are so numerous and

sometimes uncontrollable that we make no guarantees as

to your income or earnings of any kind.  Your success is

not guaranteed and will be based on your education,

effort, determination, and various market conditions.

Like every investment and any business, you can lose

money in an online business.  For full disclosures, please

read our Earnings and Income Disclaimers and Terms of

Use.

Screenshots of thesellersplaybook.com website are attached as **Exhibit E**, which

includes a longer Earnings Disclaimer that is only visible to website visitors who

click on a blue "Earnings Disclaimer" hyperlink at the bottom of the website.

113.  During some live events, but not all, Defendants briefly display an

"earnings disclaimer" on a screen or make oral earnings disclaimers.  A

photograph of a Sellers Playbook earnings disclaimer displayed on May 18, 2018,

during a 3-Day Workshop held at the Doubletree by Hilton Hotel Airport in

Orlando, Florida appears below.

NCH0045



114.   While briefly displaying the earnings disclaimer, Mike Schreiner, one of Defendants' presenters, stated as follows:

"That's why they have us do this again.  It makes the

lawyers happy, disclaimers.  But you got to do your part.

Money's not going to fall from the sky.  But as long as

you do a part, it's going to happen."

115.   Despite the earnings disclaimers, Defendants' marketing campaigns, workshops and seminars leave consumers with the net impression that they are likely to profit by implementing the Sellers Playbook System to sell on Amazon.

NCH0046

### Defendants' Failure to Provide Disclosure and Earnings Claims Statements

116.   Defendants fail to provide a written disclosure document to consumers prior to consumers' purchase of Defendants' business opportunities as required by the Business Opportunity Rule.

117.   Although Defendants make claims to consumers about their likely earnings, they fail to provide consumers with an earnings claim statement as required by the Business Opportunity Rule.

### Defendants Generated Millions of Dollars of Sales

118.   In many instances, Defendants receive credit card and debit card payments from consumers for the Sellers Playbook System.  From April 2017 to May 2018, Defendants took in more than $15 million from consumers through card payments.

119.   In many instances, credit card receipts provided to consumers at the time they purchased the Sellers Playbook System identify "Minneapolis, Minnesota" as the credit card merchant's city and state.

120.   Defendants identified Minnesota as the merchant's state in connection with opening merchant accounts necessary for processing credit and debit card payments.

NCH0047

## VIOLATIONS OF THE FTC ACT

121.   Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

122.   Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### Count I — Misrepresentations Regarding Earnings
### (By Plaintiff FTC)

123.   In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of business opportunities, Defendants have represented, directly or indirectly, expressly or by implication, that consumers who purchase and use Defendants' business opportunities are likely to earn a specific level or range of actual or potential sales, or gross or net income or profits.  Such representations include that consumers who purchase and use FBA Stores or the Sellers Playbook System are likely to earn several thousand dollars a month.

124.   The representations set forth in Paragraph 123 of this Complaint are false or misleading or were not substantiated at the time the representations were made.

125.   Therefore, Defendants' representations as set forth in Paragraph 123 of this Complaint constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

NCH0048

## VIOLATIONS OF THE BUSINESS OPPORTUNITY RULE

126.   The FTC brings this action under the amended Business Opportunity Rule, 16 C.F.R. Part 437, which was extended in scope to cover certain work-at-home opportunities, became effective on March 1, 2012, and has since that date remained in full force and effect.

127.   Defendants are "sellers" who have sold or offered to sell "business opportunities" as defined by the Business Opportunity Rule, 16 C.F.R. § 437.1(c) and (q).  Under the Business Opportunity Rule, a "seller" is a person who offers for sale or sells a business opportunity.  16 C.F.R. § 437.1(q).  Under the Rule, a "business opportunity" means a "commercial arrangement" in which a "seller solicits a prospective purchaser to enter into a new business;" the "prospective purchaser makes a required payment;" and the "seller, expressly or by implication, orally or in writing, represents that the seller or one or more designated persons will … [p]rovide outlets, accounts, or customers, including, but not limited to, Internet outlets, accounts, or customers, for the purchaser's goods or services." 16 C.F.R. 437.1 (c).

128.   Among other things, the Business Opportunity Rule requires sellers to provide prospective purchasers with a disclosure document in the form and using the language set forth in the Business Opportunity Rule and its Appendix A, and any required attachments.  In the disclosure document, the seller must disclose to

NCH0049

prospective purchasers five categories of information, including basic identifying information about the seller, any earnings claims the seller makes, the seller's litigation history, any cancellation and refund policy the seller offers, and contact information of prior purchasers. 16 C.F.R. § 437.3(a)(1)-(5). Furthermore, this information must be disclosed at least seven (7) days before the prospective purchaser signs a contract or makes a payment. 16 C.F.R. § 437.2. The pre-sale disclosure of this information enables a prospective purchaser to contact prior purchasers and take other steps to assess the potential risks involved in the purchase of the business opportunity.

129. Defendants have made earnings claims in connection with the sale of their business opportunities, as defined by the Business Opportunity Rule, 16 C.F.R. § 437.1(f). Under the Business Opportunity Rule, an "earnings claim" means "any oral, written, or visual representation to a prospective purchaser that conveys, expressly or by implication, a specific level or range of actual or potential sales, or gross or net income or profits." 16 C.F.R. § 437.1(f).

130. The Business Opportunity Rule prohibits sellers from making earnings claims unless the seller: (1) has a reasonable basis for the claim at the time it is made; (2) has in its possession written materials to substantiate the claim at the time it is made; (3) furnishes an Earnings Claim statement to prospective purchasers in conjunction with the disclosure document, containing, among other

40

things, information regarding the time frame captured by the earnings claim, the characteristics of the purchasers, and the number and percentage of all persons who purchased the business opportunity within the time frame who achieved at least the stated level of earnings; and (4) makes written substantiation of the earnings claim available to any prospective purchaser who requests it.  16 C.F.R. § 437.4(a).

131.   Defendants have also made earnings claims in connection with the sale of their business opportunities in the general media, as defined by the Business Opportunity Rule, 16 C.F.R. § 437.1(h).  Under the Business Opportunity Rule, "general media" means "any instrumentality through which a person may communicate with the public, including, but not limited to, television, radio, print, Internet, billboard, Web site, commercial bulk email, and mobile communications." 16 C.F.R. § 437.1(h).

132.   The Business Opportunity Rule prohibits sellers from making earnings claims in the general media unless the seller has a reasonable basis for and written substantiation of any earnings claims and states in immediate conjunction with those claims the beginning and ending dates when the represented earnings were achieved, and the number and percentage of all persons who purchased Defendants' business opportunity prior to that ending date who achieved at least the stated level of earnings. 16 C.F.R. § 437.4(b).

NCH0051

133.   Defendants have disseminated industry financial, earnings, or performance information in connection with the offering for sale, sale, or promotion of a business opportunity.

134.   The Business Opportunity Rule prohibits sellers from disseminating industry financial, earnings, or performance information unless the seller has written substantiation demonstrating that the information reflects, or does not exceed, the typical or ordinary financial earnings, or performance experience of purchasers of the business opportunity being offered for sale. 16 C.F.R. § 437.4(c).

135.   Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Business Opportunity Rule constitutes an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count II— Misrepresentations Regarding Income or Profits
### (By Plaintiff FTC)

136.   In numerous instances, Defendants have misrepresented the amount of sales, or gross or net income or profits a prospective purchaser may earn or that prior purchasers have earned in connection with the offering for sale, sale, or promotion of a business opportunity.

137.   Defendants' acts and practices, as described in Paragraph 136 above, violate the Business Opportunity Rule, 16 C.F.R. § 437.6(d) and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

NCH0052

**Counts III—Earnings Claims to Prospective Purchasers Violations**
**(By Plaintiff FTC)**

138.   In numerous instances, Defendants have made earnings claims to prospective purchasers in connection with the offering for sale, sale, or promotion of a business opportunity while, among other things: (1) lacking a reasonable basis for the earnings claim at the time it was made; (2) lacking written substantiation for the earnings claim at the time it was made; or (3) failing to provide an earnings claim statement to the prospective purchaser, as required by the Business Opportunity Rule.

139.   Defendants' acts and practices, as described in Paragraph 138 above, violate the Business Opportunity Rule, 16 C.F.R. § 437.4(a) and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count IV — General Media Earnings Claims Violations**
**(By Plaintiff FTC)**

140.   In numerous instances, Defendants have made earnings claims in the general media in connection with the offering for sale, sale, or promotion of a business opportunity while, among other things: (1) lacking a reasonable basis for the earnings claim at the time it was made; (2) lacking written substantiation for the earnings claim at the time it was made; or (3) failing to state in immediate conjunction with those claims (i) the beginning and ending dates when the represented earnings were achieved, and (ii) the number and percentage of all

NCH0053

persons who purchased Defendants' business opportunity prior to that ending date who achieved at least the stated level of earnings.

141.   Defendants' acts and practices, as described in Paragraph 140 above, violate the Business Opportunity Rule, 16 C.F.R. § 437.4(b) and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count V — Industry Financial, Earnings, or Performance Information Violations
### (By Plaintiff FTC)

142.   In numerous instances, Defendants have disseminated industry financial, earnings, or performance information in connection with the offering for sale, sale, or promotion of a business opportunity while lacking written substantiation demonstrating that the information reflects, or does not exceed, the typical or ordinary financial earnings, or performance experience of purchasers of the business opportunity being offered for sale.

143.   Defendants' acts and practices, as described in Paragraph 142 above, violate the Business Opportunity Rule, 16 C.F.R. § 437.4(c) and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count VI — Disclosure Document Violations
### (By Plaintiff FTC)

144.   In numerous instances in connection with the offer for sale, sale, or promotion of business opportunities, Defendants have failed to furnish prospective purchasers with the disclosure document and attachments required by the Business

NCH0054

Opportunity Rule, within the time period prescribed by the Rule.

145.  Defendants' acts and practices, as described in Paragraph 144 above, violate the Business Opportunity Rule, 16 C.F.R. §§ 437.2 and 437.3(a), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE CONSUMER REVIEW FAIRNESS ACT OF 2016

146.  In 2016, Congress passed the Consumer Review Fairness Act of 2016 ("CRFA"), P.L. 114-258, 15 U.S.C. § 45b.  As of March 14, 2017, the CRFA renders void, and prohibits the offering of, provisions in form contracts that restrict individual consumers' ability to communicate reviews, performance assessments, and similar analyses about a seller's products, services, or conduct.  Congress empowered the FTC and the states to enforce the CRFA with respect to contracts in effect on or after December 14, 2017.

147.  Defendants have offered, in the course of selling their business opportunities, "form contracts," imposed on individuals without a meaningful opportunity for such individuals to negotiate the standardized terms, that contain provisions described as void by Section 2(b) of the CRFA,15 U.S.C. § 45b(b)(1), in violation of Section 2(c) of the CRFA, 15 U.S.C. § 45b(c).

148.  Pursuant to Section 2(d)(1) of the CRFA, 15 U.S.C. § 45b(d)(1), a violation of Section 2(c) of the CRFA, 15 U.S.C. § 45b(c), in or affecting commerce shall be treated as a violation of a rule defining an unfair or deceptive

45

NCH0055

act or practice prescribed under Section 18(a)(1)(B) of the FTC Act, 15 U.S.C. §
57a(a)(1)(B).

### Count VII — CRFA Violations
### (By Plaintiffs FTC and State of Minnesota)

149.   In numerous instances, Defendants have offered, in the course of
selling their goods or services, form contracts that contain provisions that bar or
restrict the ability of the consumer purchasing Defendants' business opportunities
from engaging in reviews, performance assessments, and similar analyses of
Defendants' goods, services, or conduct.

150.   Defendants' acts or practices, as described in Paragraph 149 above,
violate the CRFA.

### VIOLATIONS OF THE MINNESOTA
### PREVENTION OF CONSUMER FRAUD ACT

### Count VIII — Misrepresentations Regarding Income or Profits
### (By Plaintiff State of Minnesota)

151.   The State of Minnesota re-alleges paragraphs 1 through 120 and 146
through 150 of this Complaint.

152.   Minnesota Statutes section 325F.69, subdivision 1 reads:

> The act, use, or employment by any person of any fraud, false
> pretense, false promise, misrepresentation, misleading statement or
> deceptive practice, with the intent that others rely thereon in
> connection with the sale of any merchandise, whether or not any
> person has in fact been misled, deceived, or damaged thereby, is
> enjoinable as provided in section 325F.70.

46

NCH0056

153.   The term "merchandise" within the meaning of Minnesota Statutes section 325F.69 includes goods and services. *See* Minn. Stat. § 325F.68, subd. 2.

154.   Defendants have repeatedly violated Minnesota Statutes section 325F.69, subdivision 1, by engaging in the deceptive and fraudulent practices described in this Complaint, with the intent that others rely thereon in connection with the sale of their workshops, products, goods, and services that claim to provide consumers with the tools and information needed to make a significant income selling products on Amazon.com.  Among other things, Defendants have repeatedly misrepresented the amount of sales, or gross or net income or profits a prospective purchaser may earn or that prior purchasers have earned in connection with the offering for sale, sale, or promotion of their goods and services.

155.   Due to the deceptive and fraudulent conduct described in this Complaint, consumers have made payments to Defendants for goods and services that they otherwise would not have purchased, thereby causing harm to those consumers.

156.   Defendants' conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minnesota Statutes section 325F.69.

NCH0057

## VIOLATIONS OF THE MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT

### Count IX — Misrepresentations Regarding Income or Profits (By Plaintiff State of Minnesota)

157.   The State of Minnesota re-alleges paragraphs 1 through 120 and 146 through 156.

158.   Minnesota Statutes section 325D.44, subdivision 1 provides, in part that:

> A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:
>
> . . .
>
> (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;
>
> . . .
>
> (7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;
>
> . . .
>
> (9) advertises goods or services with intent not to sell them as advertised; [or]
>
> . . .
>
> (13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

NCH0058

159.   Defendants are "persons" within the meaning of this statute.

160.   Defendants repeatedly violated Minnesota Statutes section 325D.44, subdivision 1, by engaging in deceptive and fraudulent conduct that caused a likelihood of confusion or of misunderstanding among consumers in connection with the sale of their workshops, products, goods, and services that claim to provide consumers with the tools and information needed to make a significant income selling products on Amazon.com.  Those practices include repeatedly misrepresenting the amount of sales, or gross or net income or profits a prospective purchaser may earn or that prior purchasers have earned in connection with the offering for sale, sale, or promotion of Defendants' goods and services.

161.   Due to the deceptive and fraudulent conduct described in this Complaint, consumers made payments to Defendants for workshops, products, goods, and services that they otherwise would not have purchased, thereby causing harm to the consumers.

162.   Defendants' conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minnesota Statutes section 325D.44.

## CONSUMER INJURY

163.   Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, Business Opportunity Rule,

NCH0059

CRFA, Minnesota Prevention of Consumer Fraud Act, and Minnesota Uniform Deceptive Trade Practices Act.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THE COURT'S POWER TO GRANT RELIEF

164.   Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations  of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

165.   Section 19 of the FTC Act, 15 U.S.C. § 57b, authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the Business Opportunity Rule and the CRFA, including the rescission or reformation of contracts, and the refund of money.

166.   Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction to allow Plaintiff State of Minnesota to enforce its state law claims against

NCH0060

Defendants in this Court for violations of the Minnesota Prevention of Consumer Fraud Act, and the Minnesota Uniform Deceptive Trade Practices Act.  Minnesota Statutes sections 8.31, 325.D.45, and 325F.70 authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the Minnesota Prevention of Consumer Fraud Act and the Minnesota Uniform Deceptive Trade Practices Act.

### **PRAYER FOR RELIEF**

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and the Business Opportunity Rule, and the Court's own equitable powers, and Plaintiff State of Minnesota, pursuant to Minnesota Statutes sections 8.31, 325.D.45, and 325F.70, and as authorized by the Court's own equitable powers, request that the Court:

A.      Award Plaintiffs such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, an order freezing assets, immediate access, and appointment of a receiver;

B.      Enter a permanent injunction to prevent future violations of the FTC Act, Business Opportunity Rule, CRFA, the Minnesota Prevention of Consumer

NCH0061

Fraud Act, and the Minnesota Uniform Deceptive Trade Practices Act by
Defendants;

C.      Award such relief as the Court finds necessary to redress injury to
consumers resulting from Defendants' violations of the FTC Act, the Business
Opportunity Rule, CRFA, the Minnesota Prevention of Consumer Fraud Act (in
accordance with Minnesota Statutes section 8.31, the *parens patriae* doctrine, the
general equitable powers of this Court, and any other authority), and the Minnesota
Uniform Deceptive Trade Practices Act (in accordance with Minnesota Statutes
section 8.31, the *parens patriae* doctrine, the general equitable powers of this
Court, and any other authority), including but not limited to, rescission or
reformation of contracts, restitution, the refund of monies paid, and the
disgorgement of ill-gotten monies;

D.      Award civil penalties pursuant to Minnesota Statutes section 8.31,
subdivision 3, for each separate violation of Minnesota Statutes sections 325F.69
and 325D.44;

E.      Award Plaintiff FTC the costs of bringing this action;

F.      Award Plaintiff State of Minnesota its costs of investigation and
attorneys' fees, as authorized by Minnesota Statutes section 8.31, subdivision 3a;
and

NCH0062

G.    Award such other and additional relief as provided by law or as the

Court may determine to be just and proper.

                              Respectfully submitted,

                              ALDEN F. ABBOTT
                              General Counsel

Dated: July 30 , 2018         _Robert Anguizola_____
                              Roberto Anguizola
                              Illinois Attorney # 6270874
                              Minnesota Attorney #0301115 (voluntarily
                              restricted)
                              (Seeking admission pro hac vice)
                              Tel. (202) 326-3284
                              Email: ranguizola@ftc.gov

                              Claire Wack
                              Maryland Attorney # 1312190275
                              (Seeking admission pro hac vice)
                              Tel. (202) 326-2836
                              Email: cwack@ftc.gov

                              Federal Trade Commission
                              600 Pennsylvania Avenue, N.W.
                              Mail Drop CC-8528
                              Washington, DC 20580

                              Attorneys for Plaintiff
                              FEDERAL TRADE COMMISSION

                              and

53

NCH0063

LORI SWANSON
Attorney General
State of Minnesota

Dated: July 28 , 2018

*Frances L. Kern*

Frances L. Kern
Minnesota Attorney # 0395233
Assistant Attorney General
Minnesota Attorney General's Office
445 Minnesota Street, Suite 1200
St. Paul, Minnesota 55101-2130
(651) 757-1373 (voice)
(651) 296-7438 (fax)
(651) 297-7206 (TTY)
Email: Frances.Kern@ag.state.mn.us

Attorneys for Plaintiff
STATE OF MINNESOTA

54

NCH0064